MYERS, P.J.,
for the Court.
¶ 1. King Young Brown, Jr., was convicted of Count I, manslaughter, and Count II, rape, and was sentenced under Count I to serve twenty years and under Count II to serve thirty years in the custody of the Mississippi Department of Corrections, both sentences to run consecutively. Brown appeals his conviction and sentence, seeking review of eleven issues, some of which have been combined for purposes of *857 judicial economy. Brown asks (1) whether the trial court erred in granting a manslaughter instruction; (2) whether the trial court erred in allowing expert testimony identifying characteristics of hair samples recovered at the crime scene; (3) whether the trial court erred in allowing testimony from a DNA analyst; (4) whether the trial court erred in denying the motions for a new trial, a directed verdict, and a mistrial; (5) whether the trial court erred in admitting certain photographs; (6) whether the trial court erred in finding probable cause existed for the search and seizure of Brown’s hair, blood, and saliva; (7) whether the trial court erred in limiting Brown’s cross-examination of the State’s fingerprint expert; and (8) whether the trial court erred in dismissing a juror for failing to follow instructions during the course of the trial. Following a thorough review, we find no error and affirm.
FACTS AND PROCEDURAL HISTORY
¶2. R.W., a six-year-old girl, was last seen alive on April 20, 2002.[1] On that Saturday afternoon, R.W. and her mother visited R.W.’s great-grandmother. R.W. was given permission to play on the swings at a park located close to her great-grandmother’s home. R.W. returned to her great-grandmother’s home, but later she asked to return to the park to swing. R.W.’s mother granted her permission to play on the swings in the park; however, R.W. never returned home. R.W.’s mother subsequently reported to the police that her daughter was missing, and a search for R.W. began near her great-grandmother’s home.
¶ 3. RW.’s great-grandparents lived next door to Brown, who lived with his mother, Gloria Spencer; stepfather, Leon Spencer; and grandfather, Willie Spencer. After R.W.’s disappearance, Leon discovered a large bag he did not recognize in his garbage can. The garbage was located near the backdoor of his home and was too heavy to easily lift. Leon cut open the bag and discovered another bag inside. Leon then became suspicious and brought the bag to the attention of the police officers who were assisting in the search for R.W. Officer James Whitehead responded and cut open the second bag, which contained the remains of R.W. The Mississippi Crime Laboratory was called and arrived later that evening to take the evidence and the body of R.W. for evidence processing. The body and evidence were subsequently transported to Jackson, Mississippi, and an autopsy was performed on R.W.’s body. Evidence was then sent to the Mississippi Crime Laboratory and to ReliaGene Technologies in New Orleans, Louisiana for testing.
¶ 4. Brown was indicted for the rape and murder of R.W. At the State’s request, the trial court ordered blood, saliva, and hair samples to be taken from Brown. The trial, where Brown was convicted, was eventually held in November 2005, following two earlier mistrials. After jury deliberations of approximately nine hours, Brown moved for a mistrial, which was denied. Brown was subsequently found guilty of rape and manslaughter. Brown moved for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a motion for new trial. Both motions were denied, and Brown was sentenced to serve twenty years for the manslaughter conviction and thirty years for the rape conviction in the custody of the Mississippi Department of Corrections, both sentences to ran consecutively. Brown now appeals his conviction and sentence.
*858 DISCUSSION
I. WHETHER THE TRIAL COURT ERRED IN GRANTING MANSLAUGHTER INSTRUCTION S-6.
¶ 5. “In determining whether error exists in granting or refusing jury instructions, the instructions must be read as a whole; if the instructions fairly announce the law and create no injustice, no reversible error will be found.” Jones v. State, 962 So.2d 1263, 1272 (¶ 33) (Miss. 2007) (citation omitted). In addition, “[t]o have an instruction granted the proponent must show that (1) the instruction is supported by the evidence and that (2) the instruction is a correct statement of the law.” Adkins v. Sanders, 871 So.2d 732, 737 (¶ 11) (Miss.2004) (quoting Turner v. Temple, 602 So.2d 817, 823 (Miss.1992)). This Court recognizes that:
a lesser included offense instruction should be granted unless the trial judge — and ultimately this Court— can say, taking the evidence in the light most favorable to the accused, and considering all reasonable favorable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lesser included offense (and conversely not guilty of at least one essential element of the principal charge).
Greenlee v. State, 725 So.2d 816, 823 (¶ 14) (Miss.1998) (quoting Harper v. State, 478 So.2d 1017, 1021 (Miss.1985)). Basically, “where the evidence could only justify conviction of the pi'incipal charge could a lesser-included offense instruction be refused.” Harveston v. State, 493 So.2d 365, 374 (Miss.1986) (quoting Fairchild v. State, 459 So.2d 793, 800 (Miss.1984)).
¶ 6. Brown now argues on appeal that jury instruction S-6 regarding manslaughter was improperly submitted to the jury. Brown previously objected to the instruction at trial because he argued that the evidence did not support a manslaughter instruction. The instruction in question stated that “The Court instructs the Jury that every killing of a human being without authority of law is either murder or manslaughter; murder when done with deliberate design to affect the death of the person killed, and manslaughter when done without malice, or in the heat of passion.” The trial court allowed the manslaughter jury instruction S-6, over Brown’s objection.
¶ 7. The evidence presented in this case was largely circumstantial, and the State’s theory of the case was that a large amount of the evidence pointed to Brown. The State argued that from the facts and evidence presented at trial, the most logical explanation was that Brown was responsible. The State’s evidence included testimony identifying Brown’s fingerprints and hah' found at the scene of the crime. The State further presented evidence showing that the body of R.W. had been located in a garbage can in his backyard, in two unique bags that most likely came from a locked storage shed in his backyard.
¶ 8. In this case, the jury was given instructions on both murder and manslaughter. The question for this Court is whether, looking at the evidence presented at trial, any rational jury could have found Brown not guilty of murder, but guilty of manslaughter. Greenlee, 725 So.2d at 823 (¶ 14) (quoting Harper, 478 So.2d at 1021). The jury evaluated all the evidence and witnesses presented at trial and found that Brown was guilty of manslaughter, but not murder. This Court acknowledges that “[wjhether a defendant has committed murder or manslaughter is ordinarily a question to be resolved by the jury.” Schankin v. State, 910 So.2d 1113, 1117 *859 (¶ 8) (Miss.Ct.App.2005) (quoting Stratum v. State, 729 So.2d 800, 806 (¶ 24) (Miss. 1998)). From the facts surrounding this case, this Court cannot find that the trial court erred in allowing the S-6 jury instruction. This issue is without merit.
II. WHETHER THE TRIAL COURT ERRED IN ALLOWING EXPERT TESTIMONY IDENTIFYING THE CHARACTERISTICS OF HAIR SAMPLES RECOVERED AT THE CRIME SCENE.
 ¶ 9. This Court will review the admission of evidence under an abuse of discretion standard. Mooneyham v. State, 915 So.2d 1102, 1104 (¶3) (Miss.Ct.App. 2005) (quoting Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 34 (¶4) (Miss. 2003)). Determining whether a person sufficiently qualifies as an expert is committed to the sound discretion of the trial court and will not be reversed unless it can be said there was an abuse of discretion. McGowen v. State, 859 So.2d 320, 334-35 (¶ 50) (Miss.2003) (quoting Duplantis v. State, 708 So.2d 1327, 1338-39 (¶ 45) (Miss. 1998)). “Hair analysis is a very useful tool in criminology.” Bevill v. State, 556 So.2d 699, 707 (Miss.1990). In fact, “hair and fiber comparisons have long been recognized in Mississippi courts.” McGowen, 859 So.2d at 341 (¶ 72). Under Mississippi Rule of Evidence 702, “the witness must be qualified as an expert because of the knowledge, skill, experience, training, or education he or she possesses.” In addition, “the witness’s scientific, technical, or other specialized knowledge must assist the trier of fact.” Mooneyham, 915 So.2d at 1104 (¶3) (citing Watkins v. U-Haul Int'l Inc., 770 So.2d 970, 973 (¶ 10) (Miss. Ct.App.2000)).
¶ 10. Brown contends on appeal that the trial court erred in failing to hold a hearing on the admissibility of the ham comparisons. Further, Brown argues that the trial court eixed in admitting expert testimony stating that the hair samples from the crime scene had the same characteristics as known hair samples belonging to Brown and R.W. The State argues that the expert testimony on forensic hair examination met the test articulated in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) because it was offered by a person with knowledge, skill, and experience in the field; and the testimony assisted the trier of fact in the case.
¶ 11. Brown cites to McGowen in support of his argument that a hearing should have been held on the admissibility of the evidence and also for the proposition that “microscopic hair and fiber comparisons are not the probative evidence they once were esteemed to be.” McGowen, 859 So.2d at 340 (¶ 70). However, in McGowen the court actually determined that no separate hearing was required, and the expert testimony regarding the hair samples was determined to have been properly admitted. Id. Moreover, the court in McGowen reiterated the fact “that hair and fiber comparisons have long been recognized in Mississippi courts.” Id. at 341 (¶ 72).
¶ 12. Here, the trial court accepted Emil Lyon as an expert in the field of forensic science, specifically in hair comparison and analysis. The State presented testimony that Lyon underwent a one-year training program at the crime laboratory regarding forensic hair examination. Testimony additionally established that Lyon was certified by the American Board of Criminalistics and by the Mississippi Crime Laboratory. Lyon testified regarding several hairs that were found at the scene and on the body of R.W. Lyon testified that some of those hairs were consistent, meaning had the same characteristics, with known hair samples provided by *860 Brown and some of those hairs were consistent with hair samples from the victim, R.W.
¶ 13. This Court cannot find the trial court abused its discretion in allowing Lyon’s expert testimony regarding the characteristics of hair samples recovered from the crime scene. The testimony provided by Lyon was based on his expertise, skill, and experience in the field of forensic ham examination; and Lyon’s testimony was helpful to the jury in formulating its verdict. Therefore, we find this assignment of error to be without merit.
III. WHETHER BROWN’S RIGHT TO CONFRONT HIS ACCUSER WAS VIOLATED BY ALLOWING TESTIMONY FROM A DNA ANALYST WHO DID NOT CONDUCT THE ACTUAL TESTS ON THE DNA SAMPLES.
¶ 14. “The standard of review for admission of evidence is abuse of discretion.” Debrow v. State, 972 So.2d 550, 552 (¶ 6) (Miss.2007) (citing Smith v. State, 839 So.2d 489, 494 (¶ 6) (Miss.2003)). “[W]hen the testifying witness is a court-accepted expert in the relevant field who participated in the analysis in some capacity, such as by performing procedural checks, then the testifying witness’s testimony does not violate a defendant’s Sixth Amendment rights.” Id. at 554 (¶ 14) (quoting McGowen, 859 So.2d at 339 (¶ 68».
¶ 15. Brown argues his right to confront his accuser was violated in this case because the DNA analyst who testified was not the analyst who performed the tests. Brown argues that under McGowen, it is a violation of his Sixth Amendment right of confrontation since Chris Larson, who originally performed the test, was able to testify, but did not. The State contends that the DNA expert Amrita Lal-Paterson was a qualified expert and was properly allowed to testify regarding the DNA evidence.
¶ 16. In this case, Paterson was the laboratory manager at ReliaGene Technologies, a private laboratory in New Orleans, Louisiana. Paterson, in her duties as manager, trains the laboratory analysts, reviews the analysts’ work, conducts tests, and testifies in court when necessary. Paterson is certified as an expert in the field of forensic science, specializing in DNA analysis. Paterson did not perform the tests on the DNA found at the scene, but she was the laboratory manager at the time the tests were performed. Paterson also testified at trial that although she did not perform the testing, she did review the work of Chris Larson, the analyst who actually performed the tests. In addition, Paterson testified that she further made her own analysis of the work performed by Larson. In formulating her own analysis, Paterson reviewed the entire file and the test results to reach her own conclusions on the DNA testing. Paterson completed her own report and then compared her conclusions and report with Larson’s.
¶ 17. Paterson testified regarding the DNA testing performed on two of the four hairs presented to ReliaGene Technologies by the Mississippi Crime Laboratory. She testified that DNA tests were performed on those two hairs because they contained root material sufficient for testing. DNA was extracted from these two samples and then DNA was extracted from reference samples from both R.W. and Brown. Paterson testified that the lab performed identical tests on those samples and then compared the reference sample results to the other hair samples provided. The purpose of performing these tests was in order to determine if either R.W. or Brown could be included or excluded as a donor to the hairs provided. R.W. was excluded as a possible donor of the two hairs samples. *861 However, Paterson testified that Brown could not be excluded as a possible donor of the two hairs tested. Paterson opined that one hair sample gave results for eleven of the thirteen markers which the lab tested, and the test results showed that the genetic profile of the DNA donor in that sample occurs with a frequency of occurrence of one in 19.6 trillion. The other hair sample gave results for all thirteen markers tested, and the genetic profile of the DNA donor in that sample occurs with a frequency of occurrence of one in 13.1 quintillion.
¶ 18. In this case, Brown complains that his Sixth Amendment right to confront his accuser has been violated since the analyst who actually performed the test did not testify at trial. However, Paterson, the expert who did testify at trial, actively participated in the analysis, forming her own opinion report on the DNA samples tested. She was also a laboratory manager at the time the tests were taken and was directly involved with checking the work of each analyst, and in fact performed checks on the tests run by Larson. Further, the DNA expert, Paterson, “is not so far removed from the process as to be reduced to the level of a records custodian.” Adams v. State, 794 So.2d 1049, 1057-58 (¶ 24) (Miss.Ct.App. 2001). This Court agrees with the trial court’s determination that Paterson was sufficiently involved with the analysis and overall process so as to avoid violating Brown’s Sixth Amendment right of confrontation. This issue is without merit.
IV. WHETHER THE TRIAL COURT ERRED IN DENYING THE MOTION FOR A NEW TRIAL, THE MOTION FOR A DIRECTED VERDICT, OR THE MOTION FOR A MISTRIAL.
¶ 19. The standard of review for whether a trial court’s denial of a motion for a new trial or, in the alternative, a motion for directed verdict should be overturned is abuse of discretion. Dilworth v. State, 909 So.2d 731, 736(¶ 17) (Miss.2005) (citing Howell v. State, 860 So.2d 704, 764 (¶ 212) (Miss.2003)). Brown argues that the trial court erred in failing to grant his motion for a new trial because his manslaughter conviction went against the weight of the evidence. A motion for a new trial should only be granted when “the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Withers v. State, 907 So.2d 342, 352 (¶ 31) (Miss.2005) (quoting Eakes v. State, 665 So.2d 852, 872 (Miss.1995)). It must be noted that “[t]he decision to grant a new trial rests in the sound discretion of the trial court.” Id. Finally, this Court “must consider all the evidence, not just that supporting the case for the prosecution, in the light most consistent with the verdict and then reverse only on the basis of abuse of discretion.” Id. (quoting Jackson v. State, 580 So.2d 1217, 1219 (Miss. 1991)). This Court recognizes also that “the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.” Bush v. State, 895 So.2d 836, 844 (¶ 18) (Miss.2005) (quoting Amiker v. Drugs for Less, Inc., 796 So.2d 942, 947 (¶ 18) (Miss.2000)).
¶ 20. The State pointed to evidence showing that R.W.’s body was found in Brown’s trash can located in his enclosed backyard. The State presented evidence that demonstrated that the body was found inside two unique garbage bags which could only be obtained by unlocking a shed in the backyard. The State argued that the bags were unique because they were both unusually large in size and ob *862 tained from Brown’s stepfather’s brother, who lived in Arkansas. The State put forward evidence which identified Brown’s fingerprint on the bag containing the child’s body. Testimony presented by the State’s expert explained that both head and pubic hairs can either be excluded or included as a possible match in the process an expert would use to compare known hairs to unknown hairs. The State’s expert, Lyon, further testified that if it is impossible to exclude a hair, it would mean that the two samples, the known and unknown, are indistinguishable and have the same microscopic characteristics. Lyon explained that when hairs are indistinguishable, it would mean that the hams are the same range of lengths, the same range of color, and contain the same type of pigment distribution. Lyon also explained that the Mississippi Crime Laboratory uses a high standard with a conservative approach, meaning that it would try to exclude a hair rather than try to include it. The State also submitted evidence that there were hairs found in the bag, which contained the body of R.W., that were tested by experts. The State argued that the evidence also showed that there was a pillowcase found near the child’s body that contained head hair consistent with both Brown and the victim. Additionally, the State pointed to evidence that pubic and head hairs found on the victim’s shirt had the same characteristics of Brown’s. The State also put forward expert testimony regarding head hair found in the dirty clothes located in Brown’s bedroom that exhibited the same microscopic characteristics as those of the victim’s.
¶ 21. This Court finds no abuse of discretion by the trial court in denying the motion for a new trial. It cannot be said that “the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Withers, 907 So.2d at 352 (¶ 31). Therefore, the trial court’s denial of the motion for a new trial is affirmed.
¶ 22. A directed verdict is a challenge to the sufficiency of the evidence presented by the State. Id. at 350-51 (¶ 24). When determining whether the denial of a defendant’s motion for a directed verdict was proper, “[t]he evidence is viewed in the light most favorable to the State.” Id. Further, “[a]ll credible evidence supporting the conviction is taken as true; the State receives the benefit of all favorable inferences reasonably drawn from the evidence.” Id. “Only where the evidence, as to at least one of the elements of the crime charged, is such that a reasonable and fair[-]minded jury could only find the accused not guilty, will [an appellate court] reverse.” Id.
¶ 23. This Court cannot find that the trial court abused its discretion in holding that the evidence presented by the State was sufficient for both the rape and manslaughter convictions. Therefore, this Court finds that denial of the motion for a directed verdict was proper.
¶ 24. This Court has long recognized that “whether to grant a motion for mistrial is within the sound discretion of the trial court.” Carpenter v. State, 910 So.2d 528, 533 (¶ 14) (Miss.2005) (quoting Pulphus v. State, 782 So.2d 1220, 1223 (¶ 10) (Miss.2001)). Additionally, this Court will review a trial court’s denial of a mistrial under an abuse of discretion standard. Id. “The trial court must declare a mistrial when there is an error in the proceedings resulting in substantial and irreparable prejudice to the defendant’s case; however, the trial judge is permitted considerable discretion in determining whether a mistrial is warranted since the judge is best positioned for measuring the prejudicial effect.” Sipp v. State, 936 *863 So.2d 326, 331 (¶ 7) (Miss.2006) (citing Tate v. State, 912 So.2d 919, 932 (¶ 41) (Miss. 2005)). Further, “[i]t is within the sound discretion of the trial judge as to how long he will keep the jury in deliberation, and this discretion will not be reviewed [sic] on appeal unless there has been a clear abuse of discretion.” Hardiman v. State, 776 So.2d 723, 728 (¶ 24) (Miss.Ct.App.2000) (quoting Dixon v. State, 306 So.2d 302, 304 (Miss.1975)).
¶ 25. Brown argues that the trial court committed an abuse of discretion in failing to grant a mistrial after nine hours of deliberations failed to produce a jury verdict. Brown argues that the trial court’s failure to grant the mistrial resulted in prejudice to his case because the jury was forced to render a compromised manslaughter verdict. Brown asserts, in support of his argument that the jury had been sequestered for more than one week, that the trial court had convened on the weekend, and that the jury received the case two days prior to the Thanksgiving holiday.
¶26. We find Hardiman instructive. 776 So.2d at 729 (¶ 27). The trial in Har-diman lasted for three days, and the jury deliberated the case for more than eight hours, continuing deliberations until late in the evening before reaching a verdict. Id. In that case, none of the jurors expressed a desire for the trial court to end deliberations for the night, but instead reached a verdict. Id. This Court found “under the facts and circumstances of the case ... the trial judge acted well within his judicial discretion in allowing the jury to continue to deliberate.” Id.
¶ 27. The record from the trial transcript in the instant case reflects that the trial court refused to grant a mistrial, citing in support of that decision the large number of witnesses, totaling more than thirty, more than 100 exhibits, which in-eluded photographs for the jurors to consider; and finally the lack of notes from the jury indicating to the trial court that the jury was deadlocked or unable to reach a verdict. The trial court found that while the jury had been deliberating for approximately nine hours at that time, there were clear indications that deliberations were ongoing, and therefore, granting a mistrial would be inappropriate at that time. As a result, the jury deliberations continued for more than three more hours, and the jury finally returned a verdict. Additionally, the record reflects that the trial began on November 14, 2005, and continued until November 21, 2005, lasting a total of eight days with the jury reaching a verdict on November 22, 2005.
¶ 28. Further, from this Court’s review of the record, there is no indication that the reason for the lengthy deliberations was due to the jury being deadlocked. Instead, the indication is that the jury was continuing to deliberate, sending various questions to the trial court regarding the evidence, and that the jury was considering the large amount of evidence and testimony presented during the trial. This Court finds that due to the length of the trial, complicated issues presented at trial, and the sheer amount of evidence presented, the trial court’s refusal to grant a mistrial was not an abuse of discretion. Further, based on the record, we find that the time spent by the jury in deliberation was not unduly excessive. The trial court was well within its discretion to allow jury deliberations to continue, and we, therefore, find no abuse of discretion in the court’s refusal to grant a mistrial.
V. WHETHER THE TRIAL COURT ERRED IN ADMITTING THE STATE’S PHOTOGRAPH EXHIBITS S-78, S-74, S-77, S-76, AND S-79.
¶ 29. A trial court has discretion with regard to the admission of grue *864 some photographs of the victim into evidence. Cotton v. State, 933 So.2d 1048, 1051 (¶ 11) (Miss.Ct.App.2006) (citing Walters v. State, 720 So.2d 856, 861 (¶ 12) (Miss.1998)). This Court will only overturn a trial court’s admission of photographs into evidence when it can be said that the admission was an abuse of discretion. Id. (citing Chatman v. State, 761 So.2d 851, 854 (¶ 11) (Miss.2000)). In order to determine whether the photographs have evidentiary value, several questions must be addressed. The photographs are properly admitted if the photographs can be found to “(1) aid in describing the circumstances of the killing and the corpus delicti, (2) describe the location of the body and cause of death, (3) and supplement or clarify witness testimony.” Id. at 1051 (¶ 12) (citing Westbrook v. State, 658 So.2d 847, 849 (Miss.1995)).
¶ 30. Brown objected to the introduction of these photographs into evidence and now argues on appeal that the photographs lacked evidentiary value. Brown contends that the primary reason for the introduction of the photographs was to inflame the jury. Brown argues on appeal that the probative value was largely outweighed by the prejudicial impact the photographs had on the jury. The State argues that the photographs were relevant in the case at bar, and Brown’s argument lacks merit.
¶ 31. According to testimony introduced at trial by the State’s expert, Dr. Steven Hayne, all the pictures objected to by Brown were autopsy photographs of R.W. Photograph S-78 depicted the clothing on R.W.’s body, specifically a red sock on the left foot and a white shoe and sock on the right foot; depicted skin slippage; which occurs when the skin separates from the body; and depicted a reticular pattexm pink to purple, called marbling, which is a process of decomposition. Photograph S-74 showed the left side of R.W.’s face. The photograph depicted the bruises that were present on R.W.’s face, including bruising on her forehead, right eye, and inner left check. Photograph S-77 was taken to document the absence of injuries over the arms, chest, abdomen, and the lower extremities. Photograph S-76 showed the bruising around the right eye, over the nose, and on the upper and lower lip, each measuring up to one inch. Finally, Exhibit S-79 showed the bruising on the light side of the vaginal vault at the entrance. Dr. Hayne testified that the bruising around the vaginal area would be consistent with penetration of the vagina with a non-sharp object. Further, Dr. Hayne testified at trial that the photographs, depicting the bruising and injuries to the facial area and the absence of injury to other parts of the victim’s body, were consistent with suffocation being the cause of death.
¶ 32. Applying the three-part test provided in Cotton, this Court cannot find the trial court committed an abuse of discretion in allowing the photographs into evidence. Cotton, 933 So.2d at 1051 (¶ 12). In this case, each of the aforementioned photographs were introduced by the State in order to aid the jury in several areas. The photographs helped to corroborate the medical-expert testimony of Dr. Hayne. Also, the photographs demonstrated how Dr. Hayne determined whether R.W. had been penetrated before death by showing bruising around the vaginal area. These photographs helped to supplement and clarify Dr. Hayne’s testimony regarding how he arrived at the determination R.W. had been penetrated. Also, the photographs helped to establish how Dr. Hayne arrived at R.W.’s cause of death, suffocation. The photographs also helped to clarify and explain the circumstances surrounding R.W.’s death and how Dr. Hayne *865 formulated his expert opinion. We find that the trial court did not abuse its discretion in admitting these photographs into evidence. This issue is without merit.
VI. WHETHER BROWN’S RIGHTS UNDER THE DUE PROCESS CLAUSE OF THE FOURTH, FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND THE CONSTITUTION OF THE STATE OF MISSISSIPPI WERE VIOLATED BY ALLOWING HAIR, BLOOD, AND SALIVA SAMPLES TO BE TAKEN.
¶ 33. An appellate court will review a trial court’s finding of probable cause under an abuse of discretion standard. Holloman v. State, 820 So.2d 52, 55 (¶ 11) (Miss.Ct.App.2002). Probable cause must be present in order to require a person to submit a blood sample. Culp v. State, 933 So.2d 264, 274 (¶ 24) (Miss.2005) (citing McDuff v. State, 763 So.2d 850, 854 (¶ 10) (Miss.2000)). “In order for the police to be granted a search warrant they must demonstrate to the judge evidence of underlying facts and circumstances necessary to provide a substantial basis for finding probable cause.” Id. (citing Petti v. State, 666 So.2d 754, 757 (Miss.1995)).
¶ 34. In this case, the search warrant that was submitted to the court demonstrated the following evidence: (1) that the victim was found murdered, wrapped in two garbage bags in the suspect’s garbage can, (2) that the garbage bags the victim was found in were consistent with the size and color bags found in the suspect’s home, and (3) that the garbage bags were wrapped in masking tape of the same size and color of masking tape- located in the suspect’s locked shed. The search warrant also submitted that the victim’s death likely occurred between 6:00 p.m. and 6:30 p.m. on Saturday, April 20, 2002, and that testimony further placed the suspect at his home with only his eighty-nine year-old grandfather during that time period. The warrant also submitted that a witness saw the suspect throwing two garbage bags in the trash can during the time frame of the child’s death. The warrant further demonstrated evidence that a fingerprint taken from the garbage bag which contained the victim’s body was identified as the print of the suspect, Brown. Additionally, the warrant asserted that evidence taken from the crime scene and the body of the victim was in the possession of the Mississippi Crime Laboratory and samples of blood, saliva, and hair were needed in order to test and compare to samples taken from the crime scene.
¶ 35. We find that the evidence referred to in the search warrant was sufficient to provide a substantial basis for the trial court to determine that probable cause existed and to order seizure of Brown’s hair, saliva, and blood samples for testing. Therefore, this Court can find no abuse of discretion in allowing the samples of hail1, saliva, and blood to be seized from Brown based on probable cause. This assignment of error is without merit.
VII. WHETHER THE TRIAL COURT ERRED IN LIMITING BROWN’S ABILITY TO CROSS-EXAMINE THE STATE’S FINGERPRINT EXPERT.
¶ 36. “Mississippi [Rule] of Evidence 611(b) allows liberal cross-examination so long as the issues are relevant.” Kittler v. State, 830 So.2d 1258, 1260 (¶ 8) (Miss.Ct.App.2002). “The scope of cross-examination, though ordinarily broad, is within the sound discretion of the trial *866 court and the trial court possesses inherent power to limit cross-examination to relevant matters.” Eason v. State, 916 So.2d 557, 562 (¶ 27) (Miss.Ct.App.2005) (quoting Smith v. State, 733 So.2d 793, 801 (¶ 37) (Miss.1999)). An appellate court will only overturn a trial court’s limitation on cross-examination if the trial court committed an abuse of discretion. Id. (quoting Farmer v. State, 770 So.2d 953, 958 (¶ 15) (Miss.2000)).
¶ 37. Brown argues that the trial court improperly limited his ability to cross-examine the State’s fingerprint expert, John Byrd. Specifically, Brown argues that he was unable to sufficiently question Byrd about whether the FBI required the use of a twelve-point standard to properly identify the owner of a set of prints. Brown argues that his inability to question Byrd about this issue was reversible error. At the trial court level, Brown’s counsel conducted a proffer examination of Byrd outside the presence of the jury. However, that testimony only concerned whether a standard set number of points, like twelve, should be used in making a positive fingerprint identification. Byrd testified that the FBI had made some changes which no longer required the use of twelve points.
¶ 38. Byrd, the fingerprint expert for the State, testified at trial that eleven points were used on the latent fingerprint in question in order to identify the print as Brown’s. Testimony elicited at trial also revealed that the FBI did formerly use a twelve “Galton points” standard in order to properly identify fingerprints. However, Byrd also testified that the FBI had subsequently abandoned this requirement to use a set number of points to identify prints because there was no scientific basis to justify counting points. Thus, Byrd testified that the FBI had since abandoned the requirement that there be a set number of points, formerly twelve, in order to make more accurate identification. Byrd testified that the current standard is to use a scientific methodology to compare the uniqueness of a fingerprint.
¶ 39. Some of the testimony regarding the FBI’s abandonment of the twelve-point-identification system elicited during the proffered examination was also brought up during the cross-examination at trial, although it was admittedly less extensive. Byrd admitted at trial and during the proffered examination that the FBI had formerly required a twelve-point system in order to make a fingerprint identification, but the FBI abandoned that standard in favor of using the scientific methodology of examining the uniqueness of the print itself. We do not find that the trial court improperly limited Brown’s the cross-examination of the State’s fingerprint expert at trial. Accordingly, this issue is without merit.
VIII. WHETHER THE TRIAL COURT ERRED IN DISMISSING AN AFRICAN AMERICAN JUROR FROM THE JURY DURING TRIAL.
¶ 40. Brown charges that the dismissal of an African American juror during trial violated his Sixth Amendment right to a fair trial before an impartial jury. The State argues that the juror was properly dismissed for failure to follow instructions.
¶ 41. Mississippi Code Annotated section 13-5-67 (Rev.2002) provides the proper procedure for the impaneling and substitution of alternate jurors. According to section 13-5-67, “[alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties.” Trial courts do have discretion in determining whether to replace a *867 juror with an alternate, although “the Mississippi Supreme Court has made it clear that this discretion should not be arbitrarily exercised.” Smith v. State, 956 So.2d 997, 1006 (¶ 29) (Miss.Ct.App.2007) (citing McCoy v. State, 820 So.2d 25, 29 (¶ 11) (Miss.Ct.App.2002)). “To avoid an abuse of discretion charge, our supreme court has suggested that the trial court record should reflect the exact reasons for a juror’s dismissal.” Id. In addition, “even where no valid reasons are evident from the record, an aggrieved party must demonstrate actual prejudice by the trial court’s decision before we will reverse on this ground.” Id. at 1006-07 (¶ 29).
¶ 42. This Court can find no error in the trial court’s dismissal of the juror. The trial court specifically found on the record that the particular juror had failed to follow clear instructions given numerous times during the trial not to speak to outside persons. The trial court further noted that this failure to follow basic instructions demonstrated additional concern that he may be unable to follow other, more important instructions to the jury concerning the law in the case. The juror in question was told to have no outside contact, and specifically, the juror was told to have any items he needed from home dropped off at the hotel while the jury was sequestered. However, these instructions were not followed, and he was seen talking to another person outside his hotel room. The trial court noted that all the jurors knew they were not allowed to discuss the case or have contact with anyone outside the jury. The trial court struck the juror for failing to follow instructions given by the trial court and the bailiff. Therefore, we cannot find the trial court’s striking of the juror was done in error. Further, Brown has not shown any actual prejudice resulting from the dismissal of the juror. Therefore, this issue is without merit.
¶ 43. THE JUDGMENT OF THE CIRCUIT COURT OF WASHINGTON COUNTY OF CONVICTION OF COUNT I, MANSLAUGHTER, AND SENTENCE OF TWENTY YEARS AND COUNT II, RAPE, AND SENTENCE OF THIRTY YEARS WITH SENTENCE TO RUN CONSECUTIVELY TO SENTENCE IN COUNT I, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO WASHINGTON COUNTY.
LEE, P.J., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR. KING, C.J. AND CARLTON, J., NOT PARTICIPATING.

. This Court declines to name the victims of sexual assaults.