# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00278-COA

**JOSHUA ZACHERY DEVON OATS A/K/A JOSHUA OATS**                    APPELLANT

**v.**

**STATE OF MISSISSIPPI**                    APPELLEE

DATE OF JUDGMENT:                02/22/2024
TRIAL JUDGE:                HON. ALAN D. LANCASTER
COURT FROM WHICH APPEALED:                WEBSTER COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:                TERRENCE LADWAYNE HIGH
ATTORNEY FOR APPELLEE:                OFFICE OF THE ATTORNEY GENERAL
                BY: ABBIE EASON KOONCE
DISTRICT ATTORNEY:                WILLIAM ADAM HOPPER
NATURE OF THE CASE:                CRIMINAL - FELONY
DISPOSITION:                AFFIRMED - 12/09/2025
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., LAWRENCE AND WEDDLE, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.    Joshua Zachary Devon Oats was indicted for first-degree murder for killing Jordan Alexander Gaston allegedly on May 21, 2022.  After a trial, a Webster County jury returned a verdict finding Oats guilty of manslaughter, and the court sentenced Oats to serve twenty years in the custody of the Mississippi Department of Corrections.  After his motion for a new trial or judgment notwithstanding the verdict was denied, Joshua appealed, asserting two issues for this Court's consideration.  First, he argues the trial court erred in overruling his motions for a mistrial after the jury sent several notes informing the court they were "hung."

Oats also claims the evidence was insufficient to support his conviction of manslaughter. Finding no error, we affirm.

## FACTUAL BACKGROUND

¶2.    On May 21, 2022, Oats was at the Eupora Discount Store on 2660 West Roane Street in Eupora, Mississippi. At the store that day, he encountered Jordan Alexander Gaston. The two began to argue over a cell phone. The pair left the store and apparently continued the argument outside. Shortly afterward, Oats returned to the store, and Gaston followed him inside. The argument ensued again, and Oats eventually shot Gaston once in the chest and twice in the back. Gaston died at the scene; Oats was arrested and charged with first-degree murder. His trial occurred on January 11-12, 2024.

¶3.    The State called Omar Ibbow to testify at trial; he was a clerk at the Eupora Discount Store on the day of the shooting. Ibbow testified that he knew both Oats and Gaston since both individuals would visit the store daily. On the day of the shooting, he first noticed Oats in the store, who was there to buy cigarettes. Gaston came into the store, and the two began "talking" about "the phone." Oats accused Gaston of taking his phone, which Gaston denied. Oats then left the store, and Gaston paid for the items he purchased and left the store.

¶4.    Ibbow testified that Oats came back into the store and "four or five minutes after [Oats] came" in, Gaston returned. The two were "arguing." As Ibbow was waiting on other customers, he heard a gunshot "three times." Oats then came up and said something to him, but Ibbow could not remember what was said. Ibbow explained that he never saw anything physical occur between the two when they were arguing.

¶5.    Ibbow also testified that the store had an internal video surveillance system.  He identified the disc containing the video at the time of the shooting.[1]  The video was introduced into evidence without objection and played for the jury.  The disc contained several video-recorded views of the outside and inside of the store.  Ibbow identified all the individuals in the video and confirmed his earlier testimony by showing Oats and Gaston being in the store at two different times.  Ibbow testified that the video showed no active violence by Gaston toward Oats before the shooting.  However, on cross-examination, Oats's attorney got Ibbow to confirm that Oats entered the store first, then Gaston entered, and after a short time, Oats left.  Gaston then left. The two are seen in the parking lot with Oats backing up from Gaston and Gaston going to his car.  Oats returns, and Gaston goes back into the store and goes directly to where Oats was standing.  Ibbow admitted that the video proved that when Gaston walked up to Oats the second time in the store, Oats started backing up.  Oats's attorney asked Ibbow whether Gaston "gets in [Oats]'s face," to which Ibbow responded, "[Y]es sir."  Finally, Ibbow admitted that he had no idea what was being said, but Oats continued to back up until he was in a corner, and then Ibbow heard the gunshots.

¶6.    The State called former Eupora patrol officer Felicia Ellison.  She testified that she and another officer were dispatched to the scene of the shooting and noticed that Oats was still there and being cooperative.  Ellison collected some of the video surveillance, shell casings, and the gun used in the shooting, and she also took some photographs.  She began an interview with Oats at the police station but had to transport him to the "emergency room"

---

[1] The video recording did not include audio.

3

for "chest pains." He was later returned to the police department.

¶7. The State called another former Eupora Police patrolman Beau Powell. Powell was dispatched to the scene of the shooting and started care of Gaston until paramedics arrived. He testified that the shooting occurred as a result of a "disagreement about a cellphone." He placed Oats under arrest "for safety[,]" collected the firearm used, and testified that no firearm was collected from the victim. When shown photographs of the scene, Powell testified that Oats had several avenues of escape from the confrontation with Gaston when they were in the final position at the time of the shooting. On cross-examination, the video was played again, and Powell admitted that the two men had three separate interactions prior to the shooting: the first in the store, the second in the parking lot, and the third back inside the store. In those last two interactions, Powell admitted that it appeared Oats was backing up from Gaston prior to the shooting. In fact, back inside the store after the parking lot interaction, Powell admitted that Gaston went straight to Oats and even agreed that Gaston "got in his face." On redirect examination, Powell testified that Gaston never acted violently toward Oats but was engaged in a verbal disagreement the whole time. Also, Powell pointed out on the video the moment that Oats chambered a live round in his weapon prior to the shooting.

¶8. The State called Dr. Karen Ross, a forensic pathologist who performed the autopsy on the victim. Dr. Ross testified she discovered three gunshot wounds to the victim during the autopsy. The first gunshot wound appeared "just to the right of the midline to the chest" and traveled through the "right lung, heart, the upper and lower chambers and the aorta."

4

The projectile then "penetrated the muscle of the back" where it was recovered and introduced into evidence. Dr. Ross testified that this gunshot wound was fatal.

¶9.     Dr. Ross testified the second bullet entered in the right side of the back "where the back and shoulder" of the upper arm meet. That projectile traveled through the liver, through both lungs, the aorta, and was recovered from the right chest wall. It was also introduced as an exhibit. Finally, Dr. Ross testified the third bullet also entered Gaston's right lower back. It traveled through "duodenum and mesentery," which is the "part of the body that carries blood to the bowels." Dr. Ross explained that all three gunshots produced bleeding that contributed to the victim's death. Accordingly, she labeled all three gunshot wounds as "fatal." Dr. Ross concluded by explaining to the jury that all three wounds were not contact wounds—meaning they were fired at some distance—and she classified the victim's death as a homicide. With that testimony, the State rested.

¶10.    The defense called numerous witnesses. The first was Bobbie Flowers, who was a neighbor of Oats at the time of the shooting. She testified that on the day of the shooting, she received a telephone call from Oats. Oats asked her to go next door and "tell his wife to answer the phone." She could hear people talking in the background and then heard gunshots.

¶11.    The defense then called Harley Murrah, who was present at the Pure Mart store at the time of the shooting. Murrah testified she did not know either individual involved in the shooting but noticed them when she arrived at the store because they were "arguing." At some point, both individuals left the store and were "carrying on around the parking lot."

She noticed that Oats was being "pursu[ed]" by Gaston. They then came back into the store and continued arguing. Murrah testified that Oats was "steadily trying to get away from [Gaston] and eventually ended up by the Coke cooler." She testified that she "repeatedly" heard Oats telling Gaston, "[G]et away from me. I have a gun. I will shoot you." Murrah testified that Gaston then responded, "[Y]ou got a gun, but you still a b*tch," and "went to swing at him." That is when she heard three shots. On cross-examination by the State, Murrah admitted that you never see the victim "swing" or try to throw a punch at Oats, but she stated she saw "a man probably fixing to get swung on."

¶12. The defense called Jennifer Taylor as its last witness. She, too, was at the Pure Mart on the night of the shooting. Taylor testified that she and Murrah went to get a "vape" at the store. First, Taylor advised that she would be happy to answer questions but she could not "watch the video" of the shooting.[2] Then Taylor testified that the two men were arguing and relayed the same sequence of events as the witnesses. She added when they came back into the store, "[T]hey started arguing again. They ended up in the corner, and [Oats] told [Gaston] to get out of his face or something like that. And then the shots were fired." She testified that Oats had gone outside to avoid the situation and told Gaston several times he had a gun and to "get out of his face." The defense rested, and the State offered no rebuttal witnesses.

¶13. Relevant to the issues on appeal, after being charged in the law by the court and having heard arguments of counsel, the jury began deliberations at approximately 6:15 p.m.

_____

[2] Taylor explained that she had a child who had been shot.

At 8:24 p.m., the jury sent a written note to the court advising, "[W]e have a hung jury."[3] The court read a proposed *Sharplin* instruction to the State and defense,[4] and neither objected to the court giving that instruction. The court called the jury back into the courtroom and read the standard *Sharplin* instruction.

¶14. At approximately 8:50 p.m., the jury sent the court another note requesting, "[C]an we have a recess until tomorrow?" The court, relying on Mississippi Rule of Criminal Procedure 23.1(b), sent the jurors home for the night to return the next day to continue deliberations. The court was careful to issue the required admonitions to the jury, *see* MRCrP 18.7. The defense registered, "I'm going to object." The defense did not spell out a particular objection, nor did it move for a mistrial at this point. The trial court then recessed deliberations for the day.

¶15. The next day, January 12, 2024, the jury returned to the courtroom, and the court questioned the jurors as to whether they were able to follow the court's instruction from the night before. Among other things, the court ensured that the jurors had not spoken to or been contacted by anyone about the case, watched any news coverage about the case, or deliberated with any fellow juror. All answering in the negative, the court allowed the jury to return to continue deliberations.

---

[3] At this point, this was actually the fourth note sent to the court. The first was sent at approximately 7:16 p.m., when the jury asked for pens and pads. At approximately 7:26 p.m., the jury asked for the password to the "computer." And at 8:15 p.m., they asked for a transcript of Murrah's testimony. The court denied the request for a transcript since it was not in evidence.

[4] *See Sharplin v. State*, 330 So. 2d 591 (Miss. 1976).

¶16. Approximately an hour later, at 10:08 a.m., the court received another note from jury reading, "[W]e are still hung." The court indicated it was considering giving the *Sharplin* instruction again, to which Oats's attorney responded, "[I]f they are – you know if their conviction is they are not going to change their mind, I would like to just, at this point, just move on . . . call it a mistrial and move on." The court did not treat those comments as a motion for a mistrial and never ruled on such a motion. Rather, the court had the jury return to the courtroom and read to them again the *Sharplin* instruction and again, sent them back out to continue deliberations.

¶17. At approximately 11:30 a.m., the jury sent another note to the court which read, "[W]e are still a hung jury. Can we break for lunch?" The court again discussed the note with trial counsel. The court brought the jury into the courtroom, read them the same admonition, and allowed them to go to lunch with instructions to return at 12:45 p.m. There was no objection made by either party. Upon returning from lunch, the court again ensured the jury was able to follow the court's admonitions about any outside contact. The court, hearing all negative responses, sent the jury back for further deliberations.

¶18. After the jury left the courtroom, Oats's attorney made a motion for a mistrial, arguing that "it appears that the Court is making - - is making - - coercing a jury to deliberate at this point in this matter." The court denied the motion for a mistrial. The jury returned a guilty verdict of manslaughter at approximately 3:18 p.m. The jury was polled, and every juror agreed that was the verdict of the jury.

¶19. On February 20, 2024, the judge sentenced Oats to serve twenty years in MDOC

custody. Oats filed a motion for a new trial or judgment notwithstanding the verdict, which was denied. Oats then filed a notice of appeal alleging two errors: (1) the court erred in "failing to grant a mistrial," and (2) the evidence was "insufficient" to support Oats's conviction.

## ANALYSIS

### I.    Mistrial

¶20.    Oats argued in his brief before this Court that the trial court erred by failing to grant a mistrial when the jury sent notes advising that it was "hung." This Court "employs an abuse-of-discretion standard of review to determine whether a trial judge erred in denying a request for a mistrial." *Sharkey v. State*, 265 So. 3d 151, 155 (¶14) (Miss. 2019) (citing *Pitchford v. State*, 45 So. 3d 216, 240 (Miss. 2010)). The entire argument on this issue in Oats's brief reads as follows:

> On two separate days during jury deliberations, the jury advised the [c]ourt that they had a hung jury. In totality, the jury advised the [c]ourt on 3 occasions that they had a hung jury. Defense counsel asked for a mistrial in the case that was denied. The judge appeared to be coercing the jury to reach a verdict in this case.

¶21.    Oats cited no authority, advanced no argument, and presented nothing by way of either authority or argument on how the trial court abused its discretion. The Mississippi Rules of Appellate Procedure are clear on the requirement that authority and argument must be cited and made, or an issue will be procedurally barred. Mississippi Rule of Appellate Procedure 28(a)(7) states that "[t]he argument shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities,

9

statutes, and parts of the record relied on." M.R.A.P. 28(a)(7).[5]  "[T]he rule does not simply require a party to mention authority; the authority must be used to **develop the argument in a meaningful way**."  *Walker v. State*, 197 So. 3d 914, 919 (¶25) (Miss. Ct. App. 2016) (emphasis added) (quoting *Archer v. State*, 118 So. 3d 612, 621 (¶29) (Miss. Ct. App. 2012)). "Arguments that do not comply" with the Rule are in turn "procedurally barred." *Hill v. State*, 215 So. 3d 518, 524 (¶10) (Miss. Ct. App. 2017) (citing *Cowart v. State*, 178 So. 3d 651, 666 (¶39) (Miss. 2015)).  We find the language in Oats's brief on this issue is wholly insufficient—it fails to cite any authority and fails to provide any meaningful argument.  As such, the brief does not comply with Rule 28(a)(7), and this issue is procedurally barred.  *See Siggers v. State*, 342 So. 3d 1213, 1218 (¶16) (Miss. Ct. App. 2022) (quoting *Stewart v. State*, 291 So. 3d 738, 748 (¶39) (Miss. 2020)); *see also Patton v. State*, 109 So. 3d 66, 75 (¶22) (Miss. 2012); *Hill v. State*, 940 So. 2d 972, 973-74 (¶5) (Miss. Ct. App. 2006).

¶22.    Procedural bar notwithstanding, it is important to note that the defense only made a motion for a mistrial once.[6]  The only motion for a mistrial came after the jury sent a note

---

[5]  The Mississippi Rules of Appellate Procedure were updated in 2016; Rule 28(a)(6) is now Rule 28(a)(7).

[6]  The defense did mention a mistrial when a note was sent out at 10:08 a.m. on January 12, 2024, which read, "We are still hung."  The defense stated, "if their – their conviction is they are not going to change their mind, I would like to just, at this point, just move on, your Honor . . . call it a mistrial and move on. That's my position."  Those comments are not sufficient to make a motion for a mistrial.  Even if this Court considered such comments as a motion for a mistrial, the defense never obtained a ruling.  The law is clear that the burden is on the moving party to raise the motion and obtain a ruling to preserve the issue for appeal: "It is the responsibility of the movant to obtain a ruling from the court on motions filed by him and failure to do so constitutes a waiver of same." *Aday-Cazorla v. State*, 309 So. 3d 1169, 1173 (¶11) (Miss. Ct. App. 2021) (citing *Martin v. State*, 354 So. 2d 1114, 1119 (Miss. 1978)).  "Generally, when a trial court has not ruled on

10

dated January 12, 2024, at 11:30 a.m. on the second day of jury deliberations. That note

relayed to the court, "[W]e are still a hung jury. Can we break for lunch?" The court brought

the jury into the courtroom, read its admonitions, and allowed the jury to go to lunch and

return to court by 12:45 p.m. When the jury returned to the courtroom after lunch, the court

again inquired of the jury if they were able to abide by the earlier instructions, to which all

responded appropriately. The court then sent the jury out to continue deliberations. Only

after the jury left the courtroom did counsel for Oats ask for a mistrial, which the court

denied. A motion for a mistrial must be made timely and contemporaneously.[7] We find the

motion for a mistrial was not contemporaneous.

¶23. The second procedural bar notwithstanding, Mississippi Rule of Appellate Procedure

23.5 provides guidance with the following language:

> Upon motion of a party or its own motion, the court may declare a mistrial if:
> (a) The trial cannot proceed in conformity with the law; or (b) It appears there
> is no reasonable probability of the jury's agreement upon a verdict.

Here, in each step of the deliberations created by the notes received from the jury, the court

spoke to the jury and reminded them to have no contact or discussions about the case with

outside persons and to avoid any media about the case. The jurors indicated compliance in

each instance. "This Court presumes that jurors have followed the instructions of the court,

because to presume otherwise would render the judicial system inoperable." *Evans v. State*,

---

a motion, a defendant is procedurally barred on appeal from claiming error." *Id.* (quoting *Willie v. State*, 585 So. 2d 660, 671 (Miss. 1991), *overruled on other grounds by King v. State*, 784 So. 2d 884, 889-90 (¶¶21, 23) (Miss. 2001)).

[7] *See Aday-Cazorla*, 309 So. 3d at 1173 (¶10).

226 So. 3d 1, 26 (¶60) (Miss. 2017). The circuit judge's polling of the jury confirms that the jurors followed the circuit court's instruction not to read or watch any news stories regarding the case. As stated, "[w]e must assume that jurors answer truthfully when polled[.]" *Wells v. State*, 698 So. 2d 497, 505 (Miss. 1997). Nothing in the record suggests the jury was hopelessly deadlocked or without a "reasonable probability" of not being able to reach a verdict. While the jury used the word "hung" in the notes to the court, they never indicated any further deliberations would prove futile. In fact, the many notes prove the contrary. They asked to recess for the first night on the first day and then asked to go to lunch on the second day. Those requests show the jury was willing and able to continue deliberations. After lunch and more deliberations, the jury returned a verdict. Instead of being futile without hope of reaching a verdict, the jury did exactly what was expected and continued deliberations to ultimately reach a unanimous verdict.

¶24. Further, notwithstanding the procedural bars mentioned above, this Court finds nothing in the record to support Oats's conclusion that the trial court abused its discretion by denying the only motion for a mistrial shown in the record. The trial court effectively and correctly managed the multiple notes received from the jury. Trial courts have the inherent authority and discretion to manage jury deliberations, including when to give the *Sharplin* instruction. *See Thornton v. State*, 841 So. 2d 170, 175 (¶25) (Miss. Ct. App. 2003) (citing *Hardiman v. State*, 776 So. 2d 723, 729 (¶24) (Miss. Ct. App. 2000)). This issue is without merit.

II.     **Sufficiency and Weight of the Evidence**

12

¶25. Oats asserts that "the evidence presented by the State was insufficient as a matter of law to support a conviction." He adds that the "jury's verdict was not supported by the overwhelming weight of the evidence," which we discuss after addressing the sufficiency of the evidence. This Court utilizes a de novo standard of review "[w]hen testing the sufficiency of the evidence[.]" *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018) (citing *Brooks v. State*, 203 So. 3d 1134, 1137 (¶11) (Miss. 2016)). "The relevant question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks omitted) (quoting *Hearn v. State*, 3 So. 3d 722, 740 (¶54) (Miss. 2008)). We will "view[] all of the evidence in the light most favorable to the prosecution, accept[] all the evidence supporting the verdict as true, and give[] the prosecution the benefit of all reasonable inferences flowing from the evidence." *Quinn v. State*, 408 So. 3d 637, 640 (¶20) (Miss. 2025) (quoting *Hogan v. State*, 755 So. 2d 1073, 1075 (Miss. 2000)). "If the facts and inferences favor the defendant with such force that reasonable jurors could not find him guilty beyond a reasonable doubt, the defendant's conviction must be reversed and rendered." *Fox v. State*, 378 So. 3d 1007, 1016 (¶23) (Miss. Ct. App. 2024) (quoting *Melendez v. State*, 354 So. 3d 944, 952 (¶30) (Miss. Ct. App. 2023)). However, "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we will affirm." *Walker v. State*, 385 So. 3d 457, 463 (¶18) (Miss. Ct. App. 2023) (quoting *Melendez*, 354 So. 3d at 952 (¶30)).

¶26. In this case, the jury was instructed on the indicted charge of first-degree murder, the lesser offense of second-degree murder, and heat-of-passion and imperfect self-defense

13

manslaughter. Oats was convicted of manslaughter by the jury. Heat-of-passion manslaughter required the State to prove that Oats killed Gaston "without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense."[8] *Weaver v. State*, 265 So. 3d 182, 189 (¶25) (Miss. Ct. App. 2018) (quoting *Young v. State*, 99 So. 3d 159, 165 (¶21) (Miss. 2012)). For the jury to find imperfect self-defense, the State had to prove the killing was "intentional" yet done "without malice but under a bona fide (but unfounded) belief that it was necessary to prevent death or great bodily harm." *See id.*

¶27. The evidence, viewed in the light most favorable to the State, was sufficient to prove beyond a reasonable doubt that Oats and Gaston had an argument over a cell phone. The argument began in the store, spilled over to the parking lot, and then continued again back in the store. Witnesses heard the argument and knew it was a "disagreement." There is no doubt Oats shot Gaston and that no one ever saw a punch or any physical acts of violence by Gaston.[9] Further, witnesses heard Oats threaten Gaston with a gun. One witness described from viewing the video that you see Oats racking a chamber in round immediately prior to shooting Gaston. Gaston was seen "get[ting] in [Oats]'s face" and saying, "you got a gun, but you still a b***h." Gaston was shot once in the chest and twice in the back, and any of those gunshot wounds would have proved fatal according to Dr. Ross. Further, at one point,

---

[8] This instruction was numbered as jury instruction number seven but was submitted as instruction S-3.

[9] Murrah was the only witness who testified that she saw Gaston attempt to hit Oats before Oats shot Gaston. However, while viewing the video of the incident on cross-examination, she admitted that no such effort is ever seen.

14

Oats was at his vehicle outside, but instead of leaving, he went back into the store. Gaston followed him, and then the shooting occurred. While the evidence could be viewed as a reasonable use of self-defense, it equally could be viewed as shooting without malice, under a bona fide belief, although without reasonable cause, that it was necessary to prevent death or great bodily harm. This case was intensely factual in nature. Further, this was a classic exercise in a jury determining not only those facts and how those facts would be interpreted under the law, but also how those facts may give rise to reasonable inferences.

¶28. The jury was instructed that "it is your duty" and "exclusive province" to determine the facts. They were instructed that "as sole judges of the facts," the jury was to determine "what weight and what credibility" should be given to the testimony and the evidence. Finally, the jury was instructed that they were "permitted to draw such reasonable inferences from the evidence." The jury heard the testimony offered by the State and by Oats. The jury had more information in this case than most paneled juries are given. The many interactions between Oats and Gaston were captured on video. While the video had no audio, it offered a view of their first interaction in the store, their interaction in the parking lot, and their final interaction back inside the store. We find sufficient evidence, viewed in the most favorable light to the State, for a rational jury to find beyond a reasonable doubt that Oats could have intentionally meant to kill Gaston (he was shot three times, two of those shots were in his back) and did so "without malice but under a bona fide (but unfounded) belief that it was necessary to prevent death or great bodily harm." *See id.*

¶29. As to the weight of the evidence, "we review the evidence in the light most favorable

15

to the verdict and review the trial court's denial of a motion for a new trial under an abuse-of-discretion standard." *Rodriguez v. State*, 413 So. 3d 646, 654-55 (¶25) (Miss. Ct. App. 2025) (quoting *Pace v. State*, 369 So. 3d 588, 597 (¶33) (Miss. Ct. App. 2023)). "We will disturb a jury verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id*. When an appellant claims that the verdict is against the overwhelming weight of the evidence, "[o]nly in those cases where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice will this Court disturb it on appeal." *Green v. State,* 312 So. 3d 1214, 1217 (¶12) (Miss. Ct. App. 2021) (citing *Baker v. State*, 802 So. 2d 77, 81 (¶14) (Miss. 2001)).

¶30. The twelve jurors who heard the evidence, weighed its worth, and determined the credibility of the witnesses could reasonably and rationally find manslaughter under the evidence presented, and they did. On this issue, we view the evidence in a light most favorable to their verdict, and here, it is not against the weight of the evidence. Further, we do not find that allowing the verdict to stand would sanction an unconscionable result. Accordingly, we affirm Oats's conviction and sentence.

¶31. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR. McDONALD, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD AND LASSITTER ST. PÉ, JJ.**

**WESTBROOKS, J., DISSENTING:**

¶32. Because I would find that the trial court should have declared a mistrial after the jury

16

sent three notes advising that it was "hung," I respectfully dissent. One of the jury instructions issued by the court charged: "[D]o not surrender your honest convictions as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict."[10] The record shows that the jury deliberated more than seven hours over a span of two days. Under these circumstances, the trial court abused its discretion by "coercing" a verdict. *See Sharplin v. State*, 330 So. 2d 591, 596 (Miss. 1976). Further, I disagree with the majority's finding that the issue was not preserved for appeal.[11]

¶33.    Generally, a trial judge "may return the jury for further deliberations by simply stating to the jurors: 'Please continue your deliberations,'" if the trial judge thinks that there is a likelihood that the jury might reach a verdict. *Id.*; *see also Mouton v. State*, 227 So. 3d 1079, 1084 (¶21) (Miss. 2017) (finding the *Sharplin* instruction can be used when a jury does not reach a unanimous verdict). There are no clear standards for when a judge should grant a continuance or a recess during jury deliberations; as such, our Court focuses on the unique facts of each case when determining if the court abused its discretion. *Sipp v. State*, 936 So. 2d 326, 332 (¶13) (Miss. Ct. App. 2006) (citing *Hooker v. State*, 716 So. 2d 1104, 1113-14 (Miss. 1998)); *see also Robinson v. State*, 418 So. 2d 794, 797 (Miss. 1982) (finding four hours of deliberation was not excessive); *but see Isom v. State*, 481 So. 2d 820, 824 (Miss.

---

[10] The judge reissued this instruction from the bench multiple times when sending the jury back to deliberate.

[11] The trial record shows that Oats' attorney objected to the court's decision to recess the jury and continue deliberations the following day.

17

1985) (finding *Sharplin* instruction improper following eight hours of jury deliberation time).

¶34.    However, our supreme court has stated that "[i]t is common knowledge that jurors carefully attend the trial judge's every action. His position of authority, respect and neutrality give[s] him peculiar power to influence." *Folk v. State*, 576 So. 2d 1243, 1251 (Miss. 1991); *see Lafayette v. State*, 90 So. 3d 1215, 1219 (¶12) (Miss. 2012) (holding "[a] trial judge has great credibility with the jury, and the potential of coercion and influence is too great"); *see Bell v. State*, 202 So. 3d 1239, 1240-42 (¶¶4, 10) (Miss. 2016) (reversing verdict and remanding for a new trial after finding coercive the judge's comments to the jurors asking them not to be stubborn and to deliberate with the purpose of unanimous decision).

¶35.    In *Isom*, the jury deliberated for eight hours following a day and a half of trial proceedings. *Isom*, 481 So. 2d at 824. The jury deliberated from 3:21 p.m. until 10:38 p.m. without reaching a verdict. *Id.* At that time, three of the jurors expressed a desire to recess deliberations, but the trial court instructed them to continue. *Id.* Finally, at 11:35 pm, the jury reached a verdict finding the defendant guilty. *Id.* On appeal, the Mississippi Supreme Court reversed and remanded the case for a new trial, holding that eight hours of jury deliberations was excessive. *Id.* The supreme court considered that the length of the trial was relatively short compared to the length of deliberations and that several jurors expressed a desire to pause and continue deliberations the next day. *Id.*

¶36.    In the present case, the judge issued the *Sharplin* instruction twice. The record shows that the jury deliberated a total of seven hours and seventeen minutes. During deliberations, the jury informed the court on three separate occasions that it was "hung." After taking a

recess, the jury came back the next day to continue deliberations. Like in *Isom*, the record does not indicate that the court had any knowledge that the jury was hopeful about reaching a verdict. Throughout the duration of the seven hours of deliberation, the jury did not ask for clarity on the evidence presented, nor did jurors ask questions about the law, nor were supplemental instructions provided. *See Brown v. State*, 999 So. 2d 853, 863 (¶28) (Miss. Ct. App. 2008) (The trial court acted within its discretion to continue jury deliberations for nine hours because there was no indication that prolonged deliberations were due to a deadlock; instead, the evidence suggested that the jury was actively deliberating and sending various questions to the trial court.); *see Thornton v. State*, 841 So. 2d 170, 175-76 (¶¶21, 29) (Miss. Ct. App. 2003) (finding the court ruled that allowing the jury to deliberate for eight hours, coupled with the judge providing supplemental jury instructions after the jurors' request, did not constitute coercion). Here, the jury did not submit any additional questions regarding the law or the evidence presented at trial.[12]

¶37.    Importantly, the jury foreman did not provide the court with any indication that the jury was close to reaching a unanimous verdict. *See Sipp*, 936 So. 2d at 332 (¶13) (finding the court did not abuse its discretion by refusing to declare a mistrial after allowing the jury to resume their deliberations the following day because the jury foreman told the court they were hopeful that they would reach a verdict soon); *see also  Hardiman v. State*, 776 So. 2d 723, 729 (¶24) (Miss. Ct. App. 2000) (finding the trial judge acted within his judicial discretion in allowing the jury to continue to deliberate for approximately eight hours on one

---

[12] The jury did request the transcript (which was not provided) within the first two hours of deliberations.

day, after none of the jurors expressed a desire to recess deliberations at any time before reaching a verdict).

¶38. Here, and unlike in *Hardiman*, deliberations stretched over two days, the jury expressed a desire to recess (like in *Isom*, which reversed on this point), and the jury returned three notes that it was hung. On the first day of deliberations, the deliberations began at 6:15 p.m., and the jury indicated to the court that it was "hung" at 8:24 p.m. The court provided a *Sharplin* instruction and allowed the jurors to take a recess after they requested it at 8:50 p.m. Jurors began deliberating again at 9:00 a.m., and at 10:08 a.m. they informed the court that they were once again "hung." The court provided an additional *Sharplin* instruction, and then at 11:30 a.m. the jurors informed the court that they were "hung." The court allowed jurors to break after they requested it. Jurors continued deliberations at 12:15 p.m., and it was not until 3:18 p.m. that the jurors returned with a unanimous verdict.

¶39. Given these circumstances, we cannot trust that the members of the jury did not "surrender" their "honest judgment" for the "mere purpose of returning a verdict." The purpose of a *Sharplin* instruction is to allow for extended deliberation if there is a likelihood that the jury will come to a verdict. I agree that if a jury indicates that it is close to reaching a verdict, the court should allow deliberations to continue. However, this is not what occurred here. There is no indication that the jury was close to reaching a verdict or had a likelihood of doing so. While the circuit court judge did not explicitly say anything that could be interpreted as coercive, continuing to send the jury back after being notified three times that it was hung is implicitly coercive. At the very least, it suggests that the members of the

20

jury surrendered to the court's pressure to come to a unanimous verdict, thereby failing in their obligation to exercise each of their independent judgments as required by their oaths. Accordingly, I dissent.

**McDONALD AND LASSITTER ST. PÈ, JJ., JOIN THIS OPINION.**