# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-01003-COA

**CHRISTOPHER SMITH A/K/A CHRISTOPHER MICHAEL SMITH**                    APPELLANT

**v.**

**STATE OF MISSISSIPPI**                    APPELLEE

DATE OF JUDGMENT:             08/24/2021
TRIAL JUDGE:                  HON. TOMIKA HARRIS IRVING
COURT FROM WHICH APPEALED:    COPIAH COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:       OFFICE OF STATE PUBLIC DEFENDER
                              BY: JUSTIN TAYLOR COOK
ATTORNEY FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                              BY: CASEY B. FARMER
DISTRICT ATTORNEY:            ALEXANDER C. MARTIN
NATURE OF THE CASE:           CRIMINAL - FELONY
DISPOSITION:                  AFFIRMED - 04/11/2023
MOTION FOR REHEARING FILED:

**EN BANC.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     A jury convicted Christopher Smith of first-degree murder for the shooting of Nakisa Benson. The Copiah County Circuit Court sentenced Smith to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections. Smith appealed alleging a *Batson* analysis violation in the selection of the jury as to Jurors 8, 10, 16, and 30. Further, Smith appealed the improper admission of photographs into evidence. Finding the trial court did not err in its *Batson* analysis or evidentiary ruling, we affirm.

## PROCEDURAL HISTORY AND FACTS

¶2. On August 20, 2013, Tammy Womack was driving home when she saw a car that resembled her cousin Nakisa Benson's car in the middle of the road. Womack approached the car and saw that the car door was open, the window had been shot out, and what appeared to be a trail of blood. Womack followed the trail of blood and discovered Benson's body. She called 911, and Deputy Jeremy Thornton responded. On the scene, Thornton saw a Black Pontiac Grand Prix on the road with the passenger door open, a bullet hole in the driver's side door, broken glass throughout the car, and blood on the armrest. He also discovered 7.62-caliber shell casings on the ground around Benson's car and body.[1] Smith immediately became a suspect based on information reviewed from one of Benson's family members and Benson's police report about Smith's alleged domestic violence.[2] Benson had previously told police that she was afraid Smith would kill her. Apparently Benson wrote in the report, "I need some help or he will kill me. Make no mistake about that."

¶3. On August 23, 2013, Smith came back into the State, and the Mississippi Bureau of Investigations arrested him for Benson's murder. At the time of his arrest, law enforcement recovered an AK-47, two AK-47 magazines that were taped together, and a bag of loose 7.62-caliber bullets from the truck Smith had been driving. On November 6, 2013, a Copiah

[1] Thornton testified at trial. He explained that he obtained an arrest warrant for Smith and a search warrant for his property and recovered 7.62-caliber shell casings that matched those found at the murder scene. Thornton also testified that Benson's body was discovered about twenty to twenty-five yards from a wooden fence and that her body appeared to have sustained several gunshot wounds to her legs and waist. He explained that Benson had been shot in the car first, had gotten out of the car and climbed the fence, and then had been shot again as she tried to run away.

[2] Thornton recovered the report from Benson's car. The report was filed with the Lawrence County Sheriff's Department on May 13, 2013.

County, Mississippi grand jury indicted Smith for Benson's murder, and he was charged with one count of first-degree murder.

¶4. Prior to trial, both the State and Smith's trial counsel filed motions for a mental examination, evaluation, and treatment to determine Smith's competency to stand trial. On January 21, 2014, an agreed order for Smith's mental evaluation and treatment was entered. An additional agreed order for a psychiatric evaluation and treatment was later entered on December 18, 2014, and Smith was transported to a state hospital to receive a psychiatric evaluation and treatment to determine his competency to stand trial. On March 14, 2016, Smith's competency hearing was held. On October 20, 2016, the court entered an order finding Smith was mentally incompetent to stand trial. As a result, Smith was committed to the Mississippi State Hospital at Whitfield to receive treatment until he was declared competent to stand trial.

¶5. After treatment at Whitfield, another competency hearing was scheduled on October 20, 2020, where Dr. Mark Webb, Dr. Stephanie Howard, and Dr. Reb McMichael testified as to Smith's competency to stand trial. On October 27, 2020, an order of competence was entered declaring Smith competent to stand trial, and the parties proceeded to trial on August 18, 2021.

¶6. At trial, during jury selection, Smith's counsel exercised ten peremptory strikes on potential jurors (hereafter "juror(s)"), and the State raised a reverse-*Batson*[3] challenge to

---

[3] *See infra* note 11; *see also Miles v. State*, 346 So. 3d 840, 842 (¶3) (Miss. 2022) (citing *Bailey v. State*, 78 So. 3d 308, 318-20 (Miss. 2012)).

Smith's stricken jurors.[4]  On August 19, 2021, the State and Smith both agreed to pre-admit several photographs, search warrants, and physical evidence for trial.[5]  At trial, the State called its expert witness Dr. Mark LeVaughn to testify as to the cause and manner of Benson's death and introduced the pre-admitted autopsy photographs during his testimony. Dr. LeVaughn testified that he did not perform Benson's autopsy.  He explained that Dr. Lisa Funte, one of the forensic pathologists on his staff, performed the autopsy, but he reviewed Dr. Funte's findings and made his own "independent determination" as to the cause and manner of Benson's death.  Smith's counsel objected to LeVaughn's testimony on the grounds that Dr. LeVaughn did not perform the autopsy, and the trial court overruled the objection.  Smith did not cross-examine Dr. LeVaughn.[6]

¶7.     On August 20, 2021, Smith was found guilty of first-degree murder and sentenced to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections.  Smith's trial counsel did not file any post-trial motions, and Smith is currently incarcerated.  On August 27, 2021, a notice of appeal was filed.

¶8.     On appeal, Smith argues for a new trial, asserting three issues: (1) The trial judge failed to conduct a proper *Batson* analysis during jury selection.  *See Batson v. Kentucky*, 476

[4] During voir dire, Smith used nine of his ten peremptory strikes on white jurors, and the State raised what is commonly referred to as a reverse-*Batson* challenge.  Smith raises on appeal that a *Batson* analysis error occurred as to Jurors 8, 10, 16, and 30.  This issue will be discussed more in the Analysis.

[5] On appeal, Smith raises an evidentiary challenge against the pre-admitted autopsy photographs. These facts are further discussed in the Analysis.

[6] On appeal, Smith also argues that Dr. LeVaughn's testimony violated the United States Confrontation Clause. These facts are further discussed in the Analysis.

U.S. 79, 96-98 (1986). Smith claims the trial court failed to complete the required three-step *Batson* analysis after Smith proffered valid race-neutral reasons for his peremptory strikes on Jurors 8, 10, 16, and 30. (2) The trial court erred in allowing the pre-admitted autopsy photographs into evidence because the photographs were unauthenticated. (3) The admission of the autopsy photographs during Dr. LeVaughn's testimony violated Smith's right to confront the witness. Finding no error, we affirm.

## STANDARD OF REVIEW

¶9. This Court applies a highly deferential standard of review to a trial court's *Batson* rulings. *Miles v. State*, 346 So. 3d 840, 842 (¶5) (Miss. 2022). We follow the standard set by the United States Supreme Court, which states that "a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). In other words, great deference is given a trial court's finding of whether a peremptory challenge was race-neutral "because finding that a striking party engaged in discrimination is largely a factual finding." *H.A.S. Elec. Contractors Inc. v. Hemphill Const. Co.*, 232 So. 3d 117, 123 (¶15) (Miss. 2016) (citing *Berry v. State*, 802 So.2d 1033, 1038 (¶14) (Miss. 2001)). This Court will not overrule a trial court's *Batson* ruling unless the record indicates that the ruling was clearly erroneous or against the overwhelming weight of the evidence. *Miles*, 346 So. 3d at 842 (¶5).

## ANALYSIS

¶10. Smith argued that the trial court did not conduct a proper *Batson* analysis for his peremptory strikes of Jurors 8, 10, 16, and 30 because the trial court did not require the State

5

to prove Smith's proffered race-neutral reasons were pretext for discrimination. Smith then argued that the trial court placed the jurors back on the jury without making a factual finding of pretext, and in doing so, the trial court failed to perform step three of the *Batson*[7] analysis. Before addressing this issue, a brief explanation of the three steps required in the *Batson* analysis is necessary.[8]

¶11.    The *Batson* analysis requires three steps:

> First, the party objecting to the use of a peremptory strike has the burden to make a prima facie case that race was the criterion for the strike. Second, if the objecting party makes such a showing, the burden shifts to the striking party to state a race-neutral reason for the strike. Third, after the striking party offers its race-neutral explanation, the court must determine if the objecting party met its burden to prove purposeful discrimination in the exercise of the peremptory strike—that the stated reason for the strike was merely a pretext for discrimination.[9]

**Step One: Prima Facie Showing of Discrimination**

¶12.    To establish a prima facie showing of discrimination, the objecting party must establish

> (1) the [potential juror] is a member of a cognizable class, such as a racial

---

[7] In *Batson*, the United States Supreme Court ruled that the Equal Protection Clause "prohibits all forms of purposeful racial discrimination in selection of jurors"; therefore the State's privilege to strike individual jurors during jury selection was "subject to the commands of the Equal Protection Clause." *Batson*, 476 U.S. at 88-89. The Supreme Court established a three-step process to safeguard against racial discrimination in jury selection and held that "the prosecution may not use peremptory strikes in a discriminatory manner." *Id.*; *see also Pitchford v. State*, 45 So. 3d 216, 224 (¶13) (Miss. 2010).

[8] The supreme court's recent opinion, *Miles v. State*, 346 So. 3d 840 (Miss. 2022), is the leading precedent for *Batson* analysis, and the opinion relied heavily on the *Hardison* and *H.A.S.* principles that defined the three-step analysis.

[9] *Miles*, 346 So. 3d at 842 (¶4) (citing *H.A.S.*, 232 So. 3d at 123 (¶14)).

group; (2) the [striking party] has used peremptory strikes to remove [potential jurors] in that class; and (3) the facts and circumstances give rise to an inference that the [striking party] used peremptory strikes to purposefully remove individuals of that class.

*Hardison v. State*, 94 So. 3d 1092, 1098 (¶18) (Miss. 2012).

## Step Two: Race-Neutral Reason

¶13.    After establishing a prima facie case of discrimination, the burden shifts to the striking party to state a race-neutral reason for the strike.[10]  *Id.*  The striking party meets its burden by providing a facially valid race-neutral reason for the strike.  At this step, the trial court must assess the facial validity of the proffered race-neutral reason.  *Id.*  "[T]his process does not demand an explanation that is persuasive, or even plausible–'any reason which is not facially violative of equal protection will suffice.'"  *H.A.S.*, 232 So. 3d at 133 (¶9) (quoting *Randall v. State*, 716 So.2d 584, 588 (¶16) (Miss. 1998) (citing *Batson*, 476 U.S. at 97))).  Therefore, "unless a discriminatory intent is inherent in the [proffered reason], the reason . . . will be deemed race neutral."  *Id.*  Only if discriminatory intent is inherent will the strike be denied.  *Id.*  After the striking party meets its burden, the burden shifts to the objecting party to persuade the trial court that the proffered race-neutral reason was pretext for discrimination.  *Id.* at 123 (¶14).

## Step Three: Factual Finding of Pretext

_____

[10] Our supreme court has previously accepted "age, demeanor, marital status, single with children, prosecutor distrusted juror, educational background, employment history, criminal record, young and single, friend charged with crime, unemployed with no roots in community, posture and demeanor indicated juror was hostile to being in court, juror was late, short term employment" as sufficient race-neutral reasons for striking potential jurors. *Hardison*, 94 So. 3d at 1099 (¶23) (quoting *Davis v. State*, 660 So. 2d 1228, 1242 (Miss. 1995)).

¶14.    Persuasiveness becomes relevant at this step because the court must determine if the objecting party met its burden to prove purposeful discrimination in the exercise of the peremptory strikes.  *Miles*, 346 So. 3d at 842 (¶4) (citing *H.A.S.*, 232 So. 3d  at 123 (¶14)). It is at this step the trial judge must make a factual finding of pretext.  If the striking party meets its burden, and the trial court does not give the objecting party an opportunity to respond with a pretextual argument then the trial court fails to perform step three.  *H.A.S.*, 232 So. 3d at 123 (¶15) (citing *Hardison*, 94 So. 3d 1099 (¶24)).

> **1.    Did the trial court err in denying the peremptory strikes of Jurors 8, 10, 16, and 30?**

¶15.    During voir dire, Smith struck Jurors 2, 8, 10, 16, 27, 30, 34, 35, 39, and 43.  The State made a reverse-*Batson*[11] challenge as to Jurors 2, 8, 10, 16, 27, 30, 34, 35, and 39, alleging nine of Smith's strikes were used to exclude white jurors.  The trial judge allowed four of Smith's strikes to stand (Jurors 2, 27, 34, and 35) and denied five strikes (Jurors 8, 10, 16, 30, and 39).[12]  Four of the five denied strikes led to Jurors 8, 10, 16, and 30 being seated on the jury.  But Juror 30 served only as an alternate. On appeal, Smith's arguments concern only Jurors 8, 10, 16, and 30.

### *Hardison* and *H.A.S.*

---

[11] Our supreme court consistently has held that *Batson* applies to both the prosecution and defense.  *Hardison*, 94 So. 3d at 1097 (¶17) (citing *Griffin v. State*, 610 So. 2d 354, 356 (Miss. 1992)).  When a *Batson* challenge is raised against the defense, it is called a reverse-*Batson* challenge.  *Id.*; *see also Miles*, 346 So. 3d at 842 (¶3) (citing *Bailey*, 78 So. 3d at 318-20).

[12] Juror 39 was not reinstated on the venire, and Smith's appeal concerns only Jurors 8, 10, 16, and 30.  This opinion will address only the jurors allegedly stricken in error.

¶16. Our caselaw provides competing remedies for the trial court's imprecise and incomplete *Batson* analysis. For example, in *Hardison*, the supreme court concluded the proper remedy for the trial court's *Batson* error was to reverse and remand for a new trial. In that case, the trial judge allowed three of Hardison's peremptory strikes, but found one of Hardison's proffered reasons, juror favored the prosecution, was not a "proper or sufficient race-neutral" reason, and returned the juror to the jury pool. *Hardison*, 94 So. 3d at 1100 (¶26). On appeal, the supreme court found Hardison's proffered reason "certainly qualifie[d] as race-neutral"; therefore the trial judge was required to proceed to step three of the *Batson* analysis, pretext. *Id.* at 1099 (¶23). The supreme court explained that by "finding [Hardison's] reason was not race-neutral," the judge failed to proceed to step three and make a factual finding of pretext.[13] The supreme court concluded that the erroneous denial of Hardison's peremptory strike occurred because **the judge mistakenly found his proffered reason was not race-neutral**, and the judge's error required that the case be reversed and remanded for a new trial. In its holding, the supreme court expressed that "when a trial judge erroneously denies a defendant a peremptory strike by failing to conduct the proper *Batson* analysis, prejudice is automatically presumed, and [the court] will find reversible error."[14] *Id.* at 1102 (¶34).

---

[13] The judge never considered "how this particular strike compared to others . . . that is, whether [Hardison] had accepted black venire members who previously had served on juries that were not able to reach a decision . . . ." *Hardison*, 94 So. 3d at 1099 (¶24).

[14] The supreme court also held that the erroneous denial of a peremptory strike was not harmless error if the challenged juror "actually sits on the panel that convicts the defendant." *Hardison*, 94 So. 3d at 1102 (¶34).

9

¶17. The supreme court addressed another *Batson* issue in *H.A.S.* Although the issue was very similar to the issue presented in *Hardison*, the supreme court provided a different remedy. In *H.A.S.*, the trial court properly found a prima facie case of discrimination and required Hemphill to provide a race-neutral reason for the strike. *H.A.S.*, 232 So. 3d at 123 (¶18). But instead of considering whether Hemphill's proffered reason (the juror's age) was pretext for discrimination, the trial judge required H.A.S. to prove a pattern of discrimination. *Id.* at 124 (¶20). In response to the trial court's request, H.A.S. pointed out that two of the jurors were white females, and the trial court denied the *Batson* challenge, finding that no pattern of discrimination had been shown. *Id.* at (¶19). On appeal, the supreme court found that the trial court had erred when it required the objecting party to prove a pattern of discrimination instead of pretext. *Id.* at (¶¶20-21). The supreme court explained that the error occurred because H.A.S. was not required to prove a pattern of discrimination. *Id.* at (¶20). H.A.S. "only needed to prove purposeful discrimination in the exercise of the peremptory strike . . . the reason given was a pretext for discrimination." *Id.* (quoting *Pitchford*, 45 So. 3d at 224 (¶14)). The supreme court further explained that because the trial court mistakenly required H.A.S. to prove a pattern, step three of the *Batson* analysis was cut short, which rendered the record unclear as to "whether Hemphill's stated reason for striking [the potential juror] was race-neutral or merely a pretext for purposeful discrimination." *Id.* at (¶21). Instead of reversing and remanding for a new trial (the *Hardison* remedy), the supreme court remanded "to afford [H.A.S.] a full hearing on its claim Hemphill's strike of Taylor was discriminatory." *Id.* The supreme court also limited remand and explained that:

10

at the *Batson* hearing the parties would be limited to the record that existed at the time of the original hearing. *Id.* at 125 (¶27).[15]

***Miles***

¶18.    The two different remedies for *Batson* errors were discussed in *Miles v. State*, 346 So. 3d 840 (Miss. 2022). In *Miles*, the supreme court discussed "the appropriate remedy for errors in the trial court's application of the burden-shifting process when assessing a *Batson* challenge to a peremptory strike." *Id.* at 842 (¶3). In that case, Miles used peremptory strikes against seven white potential jurors, and, similar to this case, the State made a reverse-*Batson* challenge. *Id.* at (¶6). The trial court found that the State made a prima facie case of discrimination and required Miles to provide race-neutral reasons for each of his strikes. *Id.* The trial court accepted four of Miles's race-neutral reasons and allowed the strikes, but found Miles's reasons for Jurors 23 and 32 (employment history and prior jury service) were not race-neutral, "and then, without asking whether the State had any argument regarding pretext, the trial court placed those two individuals on the jury panel." *Id.* at 842-43 (¶6). The supreme court explained that the error occurred because the trial judge **did not perform** step three of the *Batson* analysis and **erroneously found Miles's proffered reasons were**

---

[15] The peremptory strike of juror 13 was also on appeal, but the supreme court found that the objecting party (H.A.S.) "made absolutely no attempt to meet its burden to prove [the striking party's] reason for striking Juror 13 was pretextual." *H.A.S.*, 232 So. 3d at 124-25 (¶¶22-24). The supreme court found no error in the trial court's *Batson* analysis as to this juror, explaining that because the objecting party did not meet its burden of showing pretext, "no further examination for pretext was required" by the trial court. *Id.* at 125 (¶¶25-26); *see also Pitchford*, 45 So. 3d at 227 (¶¶29-30) (When an objecting party provided no rebuttal to the State's race-neutral reasons, the supreme court held that "[w]e will not now fault the trial judge with failing to discern whether the State's race-neutral reasons were overcome by rebuttal evidence and argument never presented.").

**not race-neutral**. *Id.* at 844 (¶9). Ultimately, the supreme court affirmed this Court's holding, remand for limited *Batson* hearing in accordance with *H.A.S.*, 232 So. 3d at 125 (¶27). But before reaching that holding, the supreme court addressed the competing remedies for "errors in the trial court's application of *Batson's* burden-shifting scheme." *Miles*, 346 So. 3d at 844-45 (¶11).

¶19.    First, the supreme court discussed *Hardison*, which found the trial court's error required the case to be reversed and remanded for a new trial because the trial court erroneously had denied Hardison's right to a peremptory strike. *Miles*, 346 So. 3d at 844 (¶10). The supreme court explained that *Hardison* acknowledged that "a trial court cannot deprive defendants of their right to a peremptory strike unless the trial judge properly conducts the analysis outlined in *Batson*." *Id.* at 845 (¶11) (quoting *Hardison*, 94 So. 3d at 1102 (¶34)). "Therefore, when a trial judge erroneously denies a defendant a peremptory strike by failing to conduct the proper *Batson* analysis, prejudice is automatically presumed, and we will find reversible error." *Id.* The supreme court then held that the **erroneous denial of a peremptory strike is not harmless error if the challenged juror "actually sits on the panel that convicts the defendant.**" *Id.* (emphasis added).

¶20.    After reviewing the two obviously competing remedies, the supreme court did not overrule either of the cases. Rather, the supreme court affirmed the use of either remedy depending upon the facts and record of each case. The supreme court explained that its holding was consistent with the court's "prior decisions remanding for a post-trial *Batson* hearing when no hearing occurred or when the trial court failed to perform all steps of the

12

*Batson* analysis." *Id.* at 845 (¶13).  Post-*Miles*, it becomes clear that if the trial judge fails

to follow and complete the three-step *Batson* analysis or erroneously denies a peremptory

strike on the ground that the defense failed to articulate a race-neutral reason, we will remand

for a limited hearing for the trial judge to complete the *Batson* analysis.  However, if the trial

judge erroneously denies a valid peremptory strike by the defense, and that person served on

the jury that convicted the defendant, then we will reverse and remand for a new trial.  Now

we turn to the facts of each juror in this case.

**Juror 8**

¶21.    The first juror Smith raised on appeal is Juror 8.   The court asked Smith for a

nondiscriminatory reason for his strike of Juror 8, and Smith's attorney replied:

> MR. COLETTE:[16]  [H]e was 63 years old, and on the facts of the case, he didn't really have anything. I couldn't ascertain on his employment. I didn't have enough information on him, plus he was older, never served before. Age, primarily.
>
> THE COURT:       So because he's 63?
>
> MR. COLETTE:    [I] think it's a combination. 63 . . . . I guess it says he was a welder. [I] just didn't think he could follow or be concerned -- this case is going to be about a lot of medical. I was concerned with his age . . . and lack of a response.
>
> MR. BEASLEY:[17]  [O]ur records indicate that the defense accepted Juror Number 5 . . . which was one year younger than this juror and works in the kitchen . . . .
>
> THE COURT:       As to Juror Number 8, the Court is not going to accept the defense peremptory strike on Juror Number 8.

For Juror 8, Smith's proffered race-neutral reason was the juror's age and employment.  Age

---

[16] Mr. Colette was Smith's trial attorney.

[17] Mr. Beasley was the assistant district attorney.

13

and employment are facially valid race-neutral reasons,[18] so the trial judge properly proceeded to step three and required the State to rebut Smith's race-neutral reason. The State explained that Smith had included similar jurors, specifically Juror 5, who was one year younger than Juror 8 and worked in a kitchen. To believe Smith's race-neutral reason, the judge would have to believe that striking a white juror of a certain age while keeping a black juror of a similar age was not pretext. The record is clear that the trial judge found Smith's proffered reason was pretext and return the juror to the venire. We find no error.

**Juror 10**

¶22. The next juror Smith discussed on appeal is Juror 10, and the following exchange occurred:

> MR. BEASLEY: Your Honor, the next juror is Juror 10 . . . . Our notes show that [he] is of the white race and he didn't -- we don't have anything that he made any comment whatsoever.
>
> MR. COLETTE: [O]ur concern . . . was that he was retired and says academy something . . . . Not because of his race. He was retired . . . . At the time I made the strike in my notes [he] was a teacher in the Crystal Springs area, obviously about the time this thing would have occurred eight years ago. That's my concern.
>
> THE COURT: Juror Number 10 -- D-3 will be placed back on the jury venire . . . . [N]ext one?

Smith's proffered race-neutral reason was that Juror 10 was a "teacher." The State's only

---

[18] The Mississippi Supreme Court has accepted "age, demeanor, marital status, single with children, prosecutor distrusted juror, educational background, employment history, criminal record, young and single, friend charged with crime, unemployed with no roots in community, posture and demeanor indicated juror was hostile to being in court, juror was late, [and] short term employment" as race-neutral reasons. *Miles*, 346 So. 3d at 842 (¶4) (quoting *Davis*, 660 So. 2d at 1242).

comment as to Juror 10 was that the juror was of the "white race" and did not make any comments during voir dire. The trial judge did not articulate specific findings of pretext for Juror 10.

¶23. The Mississippi Supreme Court has consistently emphasized that the United States Supreme Court "did not articulate a particular means of accomplishing the third step." *Pruitt v. State*, 986 So. 2d 940, 946 (¶20) (Miss. 2008) (citing *Batson*, 476 U.S. at 88-89). In *Pruitt*, the supreme court rejected the argument that the trial court must make specific findings of fact regarding the race-neutral reasons and declared that

> where a trial judge fails to elucidate such a specific explanation for each race-neutral reason given, we will not remand the case for that *Batson*-related purpose alone. This Court is fully capable of balancing the *Batson* factors in cases such as this one. Continued remand of such cases only wastes the trial court's limited resources and acts to further delay justice.[19]

*Id.* at 946-47 (¶21) (citing *Burnett v. Fulton*, 854 So. 2d 1010, 1016 (Miss. 2003)).[20] "As long as a trial judge affords the parties a reasonable opportunity to make their respective records, he may express his *Batson* ruling on the credibility of a proffered race-neutral explanation in the form of a clear rejection or acceptance of a *Batson* challenge." *Id.* at 946 (¶20); *see also Corrothers v. State*, 148 So. 3d 278, 306 (¶68) (Miss. 2014) (finding "the trial court's failure to articulate specific findings in its ruling on the State's race-neutral reasons

---

[19] *Pruitt v. State*, 986 So. 2d 940 (Miss. 2008), was not overruled by *Miles*, 346 So. 3d 840 (Miss. 2022). In fact, *Miles* did not address *Pruitt*.

[20] In *Burnett*, the trial judge allowed the race-neutral reasons to stand, but he did not make a "specific explanation" on the record. *Pruitt*, 986 So. 2d at 946-47 (¶21) (citing *Burnett*, 854 So. 2d at 1014, 1016). The supreme court explained that "[t]he trial judge need only have submitted to the court [sic] a basis in fact so as to permit a reasonable judgment to be made that the reason is not contrived." *Id.* (citing *Burnett*, 854 So. 2d at 1016).

is not reversible error"). Similarly, in *Pettus v. State*, 295 So. 3d 993, 999 (¶20) (Miss. Ct. App. 2020), this Court concluded the trial judge completed step three of the *Batson* analysis by rejecting Pettus's *Batson* challenge and held that a trial court may express its *Batson* ruling on the credibility of a proffered race-neutral explanation in the form of a clear rejection or acceptance of a *Batson* challenge. *Id.* This issue was not expressly addressed in *Miles*, although this line of cases seems to suggest that if the court's intent is clear from the record, then the form should not outweigh the substance.[21]

¶24. Here, Smith's proffered race-neutral reason for striking Juror 10 was employment. Employment has been held to be a valid race-neutral reason.[22] Smith asserted Juror 10 was a "teacher" because the juror's information card indicated that the juror was employed at "academy." During oral argument, the State suggested Juror 10 was not a "teacher" and that his juror information card indicated that he worked at Academy Sports.[23] A review of Juror 10's information card, under "employment," shows three words. The first word is definitely "academy"; the next two words, although somewhat faded, support the State's position to

---

[21] As it relates to Juror 10, it is not clear from the record what the court actually found as to the proffered race-neutral reason. However, as to the other jurors, the record does provide a clear conclusion as to what the court found. The court denied the State's reverse-*Batson* challenge as to Jurors 2, 27, 34, and 35, which indicates that the court did make individual findings of pretext during the *Batson* process. In summary, nine jurors were objected to by the State. Four were denied, meaning they were struck from the venire. Five were placed back on the venire. The obvious conclusion, from four being struck and five being placed back on the venire, indicates that the trial court was making findings of fact.

[22] *Miles*, 346 So. 3d at 842 (¶4) (quoting *Davis*, 660 So. 2d at 1242).

[23] The official name for the business the State was referring to was "Academy Sports and Outdoors." Academy Sports and Outdoors is an American sporting-goods store chain that specializes in the sales of sporting goods, hunting, fishing, and camping equipment.

read "sports and outdoors." Therefore, Smith's proffered race-neutral reason was incorrect. Juror 10 was not a teacher. The trial court certainly understood employment could be a race-neutral reason but placed Juror 10 back on the venire, obviously finding the reason was pretext. Remanding this case as to Juror 10 would produce no new information or change the legal result. The information needed to evaluate this juror is already in the record, and no new information can be ascertained on remand. The supreme court has stated that when the record is sufficient concerning *Batson* challenges, "[t]his Court is fully capable of balancing the *Batson* factors in cases such as this one." *Pruitt*, 986 So. 2d at 946 (¶21). The trial court obviously determined the incorrect employment information asserted by Smith was pretext for the strike.[24] Under *Miles*, Smith's erroneous assertion does not require remand.

**Juror 16**

¶25. The following exchange occurred for Juror 16:

> MR. BEASLEY: [Juror 16] . . . is a white male, part of the systematic . . . he did say he had a nephew charged with shoplifting, but he said he could be fair and impartial.
>
> THE COURT: Any response?
>
> MR. COLETTE: Yes, [Juror 16] is a cattle farmer, **64 years old**, 20 years, **farmed his whole life, white male**. **My client is a black** male. I don't think there's a whole lot of consideration for my client. He has a totally different lifestyle. Cattle farmer. It concerns me he owns a lot of property. I don't see him relating to my client whatsoever, race irrespective.

---

[24] "Where a trial judge fails to elucidate such a specific explanation for each race-neutral reason given, we will not remand the case for that *Batson*-related purpose alone." *Pruitt*, 986 So. 2d at 946 (¶21); *see also Pettus*, 295 So. 3d at 999 (¶20). Here, the record in this case is sufficient for "*Batson* factors" analysis. It is important to note that *Miles* did not expressly overrule *Pruitt* or *Pettus*. If the supreme court had intended to overrule these cases in *Miles*, it would have done so.

17

| THE COURT: | [T]he Court is going to deny the peremptory strike . . . and place Juror Number 16 back into the jury venire. |
|---|---|

(Emphasis added). For Juror 16, Smith's proffered race-neutral reasons contained the following language: the juror was a "white man" and "cattle farmer" who "owned a lot property" and could not relate to Smith, a black man. The State offered no response, and the trial court placed Juror 16 back on the venire. The trial court did not err when it failed to ask the State for a pretext argument and placed the juror back on venire. Here, "discriminatory intent [was] inherent in the proffered reason." *Miles*, 346 So. 3d at 843 (¶8) ("Only if a discriminatory intent is inherent in the proffered reason will the strike be denied."). Smith not only mentioned the juror's race but also made additional comments that alluded to race being the reason for his peremptory strike. There was no error.

### Juror 30

¶26. The last juror Smith raised on appeal was Juror 30, and the following exchange occurred:

| MR. BEASLEY: | [N]umber 30 . . . **white female**. |
|---|---|
| THE COURT: | [A]ny race-neutral reason? |
| MR. COLETTE: | Title clerk at . . . Chevrolet was my issue . . . which suggested to me that . . . **she would not be an appropriate juror on behalf of my client**. |
| MR. BEASLEY: | [F]or the record, she's **only worked there three days**. |
| MR. COLETTE: | For the record . . . [in my copy] it looks like three years. **I stand corrected**. |
| THE COURT: | The Court will include Juror Number 30 back into the jury venire. |

. . . .

| THE COURT: | [O]ur two alternates will be Jurors 30 and 32. |
|---|---|

(Emphasis added). For Juror 30, Smith stated that the juror's job as a title clerk at a car

18

dealership would prohibit that juror from relating to Smith.[25]  The State responded that the

juror had only worked at the dealership for three days, and Smith responded that "I stand

corrected."  The trial judge then placed the juror back on the jury to serve as an alternate.

This situation is similar to Juror 10.  *See supra* ¶18.  Smith's response ("I stand corrected")

can be construed to mean that Smith withdrew his strike or confessed he was mistaken

regarding the juror's employment history or length of employment.  Although the trial court

did not formally complete step three, it is clear the court found the proffered reason was

pretext for discrimination and placed the juror back in the venire.[26]  The supreme court has

explained that "[t]he trial **judge need only have submitted** . . . a basis in fact so as to permit

a reasonable judgment to be made that the reason is not contrived."  *Burnett*, 854 So. 2d at

1016 (¶16) (emphasis added); *see also supra* note 15.  Most importantly, this Court applies

a highly deferential standard of review of the trial court's *Batson* ruling.  *Miles*, 346 So. 3d

at 842 (¶5).  This Court will not overrule a trial court on a *Batson* ruling unless the record

indicates that the ruling was clearly erroneous or against the overwhelming weight of the

evidence.  *Id.*  Here, there was no error.

---

[25] There is absolutely no evidence in the record to support finding Juror 30, who was a title clerk at a car dealership, would not "relate" to Smith.

[26] Moreover, although Smith does not raise any issues regarding Juror 39 on appeal, it is certainly relevant to this Court's analysis.  For Juror 39, a white male aged sixty-two, the State argued that he was in "the same age [group] as other jurors" that Smith had accepted. Smith's attorney replied, "I confess that one."  It is not entirely understood what exactly Smith "confessed."  However, when one considers the entire *Batson* process in this case, Smith used employment as a pretext, made a blatant racial argument about another juror, and here, confessed that his reason for striking Juror 39 was legally inappropriate. When reviewing the entire process, defining pretext becomes apparent.

## 2.    Did the trial court err in admitting the autopsy photographs?

¶27.   Smith also argued that the trial court erred by admitting Benson's autopsy photographs into evidence because the photographs were unauthenticated. The State claimed these evidentiary challenges were waived because Smith did not raise the issues at trial. The following exchange occurred before trial:

> MR. BEASLEY:    Mr. Colette, correct me any time I over speak, but these photos, we would like to go ahead and have them preadmitted into evidence, as well as the physical evidence submissions 3 through 9, submission 15, submission 19 to 23.
>
> THE COURT:    So it's my understanding, Mr. Colette, that you are agreeing to have them marked and entered as exhibits or evidence in this trial; is that correct?
>
> MR. COLETTE:    Only if the record would reflect I was here at 7:30 to do that.

Smith's counsel replied, "Only if the record reflect[s] I was here at 7:30 to do that," and the trial court stated that the record would reflect that Smith met at 7:30 to "pre-admit" the evidence. The trial court then went through the photographs and marked them for evidence:

> THE COURT:    Now let's go through now and get them marked appropriately. Are these photographs?
>
> MR. BEASLEY:    They're a combination of things, Your Honor: **Photographs, search warrants. The physical evidence consists of shell casings,** and submission 15 was the actual weapon that killed the victim.
>
> THE COURT:    The photographs, are they going to be cumulative or each photograph as an exhibit?
>
> MR. BEASLEY:    Each photograph will be an exhibit.
>
> MR. COLETTE:    However it's easiest for the clerk. **My understanding is there are a series of crime scene photographs**, which I would assume would be marked, and then there were **autopsy photographs** and the various evidence that's collected by the officer based on the reports, **and in conversations and in my independent review, I don't**

20

**see any foundational issues as far as objections**.

(Emphasis added).

¶28.    Admission of the evidence is reviewed using an abuse-of-discretion standard. *Young v. Guild*, 7 So. 3d 251, 262 (¶34) (Miss. 2009). A conviction will not be reversed on appeal unless the trial court abused its discretion in such a manner that resulted in prejudice to the defendant. *Sewell v. State*, 721 So. 2d 129, 138 (¶50) (Miss. 1998). Prejudice is determined using a harmless-error analysis. *Young v. State*, 99 So. 3d 159, 165 (¶20) (Miss. 2012). "Thus, where it is 'clear beyond a reasonable doubt that the error did not contribute to the verdict,' we need not reverse the conviction.'" *Smith v. State*, 136 So. 3d 424 (¶27) (Miss. 2014).

¶29.    Moreover, an objection to evidence "must be made as soon as it appears that the evidence is objectionable, or as soon as it could reasonably have been known to the objecting party . . . ." *Jackson v. State*, 299 So. 3d 823, 832 (¶21) (Miss. Ct. App. 2020) (citing *McGuire v. State*, 170 So. 3d 570, 576 (¶14) (Miss. Ct. App. 2014) (quoting *Sumner v. State*, 316 So. 2d 926, 927 (Miss. 1975))). A defendant's failure to object to the admission of evidence at trial waives his right to raise the issue on appeal. *Brown v. State*, 37 So. 3d 1205, 1212 (¶15) (Miss. Ct. App. 2009); *see also Turner v. State*, 292 So. 3d 1006, 1033 (¶¶88-89) (Miss. Ct. App. 2020) ("[A] failure to make a contemporaneous objection waives an issue for appeal purposes."). In *Jackson*, 299 So. 3d at 832 (¶21), this Court found that Jackson did not reserve his evidentiary argument for appeal because Jackson failed to make a timely objection to the admission of the evidence. In that case, Jackson's counsel made no objection

21

to the admission of a video and transcript until the day after the entire video was played for the jury. *Id.* This Court held that the issue was waived because Jackson's objection was made after the evidence was introduced and played to the jury. *Id.*

¶30. Here, at trial, Smith did not argue the submission of the photographs. Issues not presented to the trial court will not be reviewed on appeal. *Burns v. Haynes*, 913 So. 2d 424, 429 (¶18) (Miss. Ct. App. 2005). Further, failure to object at trial waives the issue on appeal. *Brown*, 37 So. 3d at 1212 (¶15).

¶31. Notwithstanding waiver, this Court reviews a trial court's decision to admit a photograph into evidence for abuse of discretion. *Mosley v. State*, 307 So. 3d 1261, 1268 (¶26) (Miss. Ct. App. 2020). A trial court judge has nearly "unlimited" discretion when determining if photographs can be admitted into evidence, "regardless of the gruesomeness, repetitiveness, and the extenuation of probative value." *Martin v. State*, 289 So. 3d 703, 705 (¶7) (Miss. 2019) (quoting *Dampier v. State*, 973 So. 2d 221, 230 (¶25) (Miss. 2008)). "Even if the photograph is gruesome, grisly, unpleasant, or even inflammatory, it still may be admitted so long as it has probative value and its introduction serves a **meaningful evidentiary purpose**." *Id.* (emphasis added) (quoting *Beasley v. State*, 136 So. 3d 393, 400 (¶21) (Miss. 2014)). A photograph is considered to have a meaningful evidentiary purpose if it helps describe the "circumstances of the killing, describes the location of the body and cause of death, or supplements or clarifies witness testimony." *Beasley*, 136 So. 3d at 400 (¶24).

¶32. Here, the State offered the autopsy photographs to prove the cause and manner of

Benson's death:

> Q. Now, Doctor, I would like to show you some photographs, and this is a little twist because they actually have already been entered into evidence, so I'm going to show them to you via this monitor.
>
> Q. I'm going to show you what's been marked previously as S-49. . . .Will you tell the ladies and gentlemen of the jury what we're looking at here?
>
> . . . .
>
> A. So the photograph of the x ray shows the chest, so in the middle -- in this part in the middle, those are the vertebra. So the right-sided chest is kind of faded out and you can see some ribs on the left side. You can see the left arm, the humorous bone. But the point of the x-ray that we take, before the autopsy actually, is to locate any foreign material or foreign objects. And **this x-ray displays three bullets or projectiles, two in the left chest cavity. Those are the very white objects, and there's a deformed bullet over on the right side**.

(Emphasis added). Dr. LeVaughn relied on the photographs when he testified as to the cause and manner of Benson's death (and likewise with Exhibits S-50, S-51, S-52, S-53, and S-54). Each exhibit (autopsy photograph) showed skin injuries caused by individual gunshot injuries from bullets or bullet fragments. Therefore, this Court cannot say that the trial court abused its discretion in admitting photographs, which ultimately was demonstrated by the witness to have meaningful evidentiary value.

¶33. Further, even if this Court were to find the trial court erred in allowing the photographs, such an error would be harmless. "An error is considered harmless when the weight of the evidence against [the defendant was] sufficient to outweigh the harm done by allowing admission of the evidence." *Smith v. State*, 352 So. 3d 1147, 1157 (¶58) (Miss. Ct. App. 2022). A harmless-error analysis prevents setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." *Croft v.*

23

*State*, 283 So. 3d 1, 11 (¶34) (Miss. 2019). This Court will not reverse a conviction for an erroneous evidentiary ruling unless the error adversely affects a substantial right of a party, or in other words, unless the ruling prejudiced the accused. *Id.* Here, Smith did not suffer any prejudice by the admission of pre-admitted evidence because the same evidence was placed before the jury through the testimony of several witnesses and other exhibits. Accordingly, the error would be harmless.

### 3. Did the admission of the autopsy photographs violate the Confrontation Clause?

¶34. Lastly, Smith argued that the admission of the autopsy photographs violated Smith's right to confront the witness. He also claimed that Dr. LeVaughn relied on "testimonial statements" made by Dr. Funte in the autopsy report and that Smith's inability to cross-examine Dr. Funte was a violation of his confrontation rights in the Mississippi and United States Constitution. The following exchange occurred regarding Dr. LeVaughn's testimony:

> MR. COLETTE: The facts are that he didn't do the autopsy. **It's been allowed for one MME to review another's work but I would object to his testimony because he didn't do the autopsy**. I think there's no question it's signed by Lisa Funte. She's not here. I would ask for a ruling on that. **Obviously there's a case that says he can do it, but I want to protect everything**.
>
> THE COURT: That's fine. Your objection is noted on the record.

(Emphasis added).

¶35. The Confrontation Clause guarantees criminal defendants the right "to be confronted with the witnesses against [them]." U.S. Const. amend. VI.; *accord* Miss. Const. art. 3, § 26.

24

In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court held that out-of-court "testimonial" statements of witnesses absent from trial are only admissible into evidence when the declarant is unavailable and the defendant has had a prior opportunity to cross-examine. *Id.* at 68. However, "this bar only applies to statements that are 'testimonial.'" *Corbin v. State*, 74 So. 3d 333, 338 (¶13) (Miss. 2011). "Nontestimonial hearsay does not trigger the need for confrontation to be admissible." *Pope v. State*, 330 So. 3d 409, 425 (¶77) (Miss. Ct. App. 2021) (quoting *Chatman v. State*, 241 So. 3d 649, 653 (¶13) (Miss. Ct. App. 2017)).

¶36. In *Walters v. State*, 206 So. 3d 524 (Miss. 2016), the Mississippi Supreme Court addressed an analogous issue when Walters's counsel objected to the admission of photographs arguing that the photographs were inadmissible hearsay and unauthenticated. *Id.* at 534-35 (¶30). On appeal, the supreme court found Walters's arguments were without merit because photographs do not meet the definition of a "statement."[27] Therefore, "[a photograph] cannot qualify as hearsay under our rules of evidence." *Id.* at 535 (¶¶31-32). Likewise, the supreme court found Walters's authenticity argument was without merit because "[a] party need only make a prima facie showing of authenticity, not a full argument on admissibility." *Id.* (quoting *Sewell*, 721 So. 2d at 140 (¶60). The supreme court explained "to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent

[27] A statement is defined as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." MRE 801(a); *accord Walters*, 206 So. 3d at 535 (¶31).

25

claims it is," and the State made a prima facie showing through testimony that accurately depicted the photographs. *Id.* (quoting MRE 901(a)). Similarly, we find Smith's hearsay and authenticity arguments are without merit.

¶37. In addition, the Mississippi Supreme Court has held that "[w]hen the testifying witness is a court-accepted expert in the relevant field who participated in the analysis in some capacity, such as by performing procedural checks, then the testifying witness's testimony does not violate a defendant's Sixth Amendment rights." *Brown v. State*, 999 So. 2d 853, 860 (¶14) (Miss. Ct. App. 2008) (quoting *McGowen v. State*, 859 So. 2d 320, 339 (¶68) (Miss. 2003)).

¶38. In *Brown*, 999 So. 2d at 860-61 (¶¶17-18), this Court addressed an analogous issue where Brown alleged that his "Sixth Amendment right to confront his accuser has been violated since the analyst who actually performed the test did not testify at trial." In that case, Paterson was not the analyst who performed the tests on the DNA found at the scene, but she was the laboratory manager at the time the tests were performed. *Id.* at 860 (¶16). At trial, Paterson testified that although she did not perform the testing, she reviewed the work of Larson, the analyst who actually performed the tests. *Id.* She also testified that she made her own analysis of the work performed by Larson. *Id.* at 860 (¶16). This Court found that Paterson actively participated in the analysis because she formed her own opinion on the DNA samples tested. *Id.* at 861 (¶18). In addition, this Court found that in her role as laboratory manager, she was directly involved with checking the work of each analyst, which included the work completed by Larson. *Id.* As a result, this Court held that Patterson was

"sufficiently involved with the analysis and overall process so as to avoid violating Brown's Sixth Amendment right of confrontation" and determined the issue was without merit. *Id*.

¶39. Since then, the supreme court has set forth two questions to determine whether an expert sufficiently participated in an analysis to satisfy a defendant's right to confrontation:

> First, we ask whether the witness has "intimate knowledge" of the particular report, even if the witness was not the primary analyst or did not perform the analysis firsthand. Second, we ask whether the witness was "actively involved in the production" of the report at issue. We require a witness to be knowledgeable about both the underlying analysis and the report itself to satisfy the protections of the Confrontation Clause.

*Jenkins v. State*, 102 So. 3d 1063, 1067 (¶13) (Miss. 2012) (citations omitted).

¶40. For similar reasons previously discussed, Smith's confrontation argument is also waived. Smith did not raise a confrontation issue at trial; therefore, he waived this argument on appeal. *Rubenstein v. State*, 941 So. 2d 735, 755 (¶48) (Miss. 2006) (citing *Walker v. State*, 671 So. 2d 581, 596 (Miss. 1995)). Smith specifically stated, "[I]n conversations, and my independent review, I do not see any foundational issues as far as objections." Smith also had the opportunity to cross-examine Dr. LeVaughn. Further, Smith agreed to admit the autopsy photographs prior to trial, and the State thoroughly explained how the "pre-admitted" autopsy photographs would be used during the witnesses' testimonies:

> THE COURT: So when you get ready for the, I guess, whoever the witness is going to be, are you going to go through each photograph? Are you going to have them look generally?
>
> MR. BEASLEY: Your Honor, what I would do is just hand them photographs initially so you recognize these that have already been previously been admitted, and at that point the witness would look through them, and then at that point we would refer to the photographs as needed.

27

THE COURT: You know what, so that the record is clear to which photograph the witness may be referring to, let's mark each one.

In addition, Dr. LeVaughn participated in the analysis. The following exchange occurred during the State's direct examination with Dr. LeVaughn:

Q. Now, Doctor, have you reviewed the autopsy of Nakisa Benson?
A. Yes, sir.
Q. Now, you did not perform the autopsy of Nakisa Benson, did you?
A. No, sir, I did not.
Q. Well - - and who was the doctor that did?
A. **The physician that performed the autopsy was Dr. Lisa Funte who was one of the staff forensic pathologists in the office.**
Q. **And she worked for you, did she not, Doctor?**
A. **Yes.**
Q. **Doctor, as you sit here today, have you reviewed her findings and made your own independent determination as to the cause and manner of death in this case?**
A. **Yes, sir, I have**.
Q. And what were those findings, Doctor, as to the manner and cause of death?
A. The autopsy report classifies the cause of death as multiple gunshot wounds, and the manner of death was homicide, and I 100 percent agree with the cause and manner of autopsy.

(Emphasis added). The record shows that Dr. LeVaughn actively participated in the autopsy report because (1) in his role as Dr. Funte's supervisor, he actively reviewed her work, and (2) he conducted an independent review of the autopsy report. Moreover, this Court has held that "[w]hen the testifying witness is a court-accepted expert in the relevant field who participated in the analysis in some capacity . . . then the testifying witness's testimony does not violate [the Confrontation Clause]." *Bufford v. State*, 191 So. 3d 755, 762-63 (¶38) (Miss. Ct. App. 2015). Dr. LeVaughn was a tenured expert witness. This issue is without merit.

28

¶41. This Court also notes that Smith made no objections to qualifying Dr. LeVaughn as an expert in the field of forensic pathology and that it is the duty of a forensic pathologist to answer "two basic questions: what was the cause of death, and what was the manner of death?" *Brown v. State*, 33 So. 3d 1134, 1138 (¶15) (Miss. Ct. App. 2009); *see also Bell v. State*, 725 So. 2d 836, 854 (¶51) (Miss. 1998). A forensic pathologist may testify as to what caused the victim's injuries and what trauma the injuries would produce. *McGowen*, 859 So. 2d at 335 (¶53). Therefore, a forensic pathologist's testimony concerning the victim's wounds, suffering, and the means of infliction of injury falls within the scope of his expertise. *Id.*; *see also Brown*, 33 So. 3d at 1139 (¶15). The trial court did not abuse its discretion by allowing Dr. LeVaughn to testify as to the cause and manner of Benson's death. Dr. LeVaughn's testimony was within the scope of his expertise as an expert in forensic pathology.

¶42. Notwithstanding waiver, even if this Court were to conclude that there was a Confrontation Clause violation, it would be subject to a harmless-error analysis. *Clark v. State*, 343 So. 3d 943, 997 (¶254) (Miss. 2022) (citing *Conners v. State*, 92 So. 3d 676, 684 (¶20) (Miss. 2012) ("Confrontation Clause violations are subject to harmless-error analysis.")), *pet. for cert. filed*, No. 22-6057 (U.S. Nov. 15, 2022). To affirm despite a Confrontation Clause violation, a reviewing court must find from a consideration of all the evidence that the error was harmless beyond a reasonable doubt. *Bufford*, 191 So. 3d at 761 (¶26). Even if Dr. LeVaughn's testimony had been excluded, the evidence of Smith's guilt was abundant. The violation would be harmless.

# CONCLUSION

¶43. After review of the record, we find no reversible error in the trial court's *Batson* analysis or the subject evidentiary rulings, and in accordance with the controlling precedent *Miles*, we affirm Smith's conviction and sentence.

¶44. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS AND McDONALD, JJ., CONCUR IN PART AND DISSENT IN PART WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McDONALD, JJ.**

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶45. Just last year, a unanimous Mississippi Supreme Court declared that when a trial court fails to follow all steps of the *Batson* analysis, the proper solution is to remand for a post-trial hearing. As the majority acknowledges, during voir dire the trial court did not articulate the reason Juror 10 was placed back on the venire. Because precedent requires us to remand for a post-trial hearing, I respectfully dissent.

¶46. Just like this case, the one considered in 2022 by the Supreme Court involved a "reverse-*Batson* challenge, which is a *Batson* challenge made against the defense." *Miles v. State*, 346 So. 3d 840, 842 (¶3) (Miss. 2022). And just like here, "the trial judge did not perform the third step of the *Batson* analysis." *Id*. at 844 (¶9).

¶47. In a lengthy review of cases going back to the 1980s, the unanimous Court found that its modern precedent was in line with "prior decisions remanding for a post-trial *Batson* hearing when no hearing occurred or when the trial court failed to perform all steps of the

*Batson* analysis." *Id*. at 845 (¶13).

¶48.     Here's exactly what the unanimous Court held:

> The time has come for this Court to resolve the discrepancy between the remedies for a trial court's failure to conduct a complete *Batson* analysis[.] . . . [T]he remedy for the trial court's failure to follow the three-step *Batson* analysis is to remand for a hearing, limited to using the record as it existed at the time of the original *Batson* hearing, at which the proper *Batson* analysis must be completed. After the hearing, an appellate court can review the trial court's *Batson* rulings to determine whether they were clearly erroneous or against the overwhelming weight of the evidence.

*Id*. at 846 (¶16).

¶49.     In this case, the trial court never conducted the third step of the *Batson* analysis. Nonetheless, and without citation, the majority decides that because defense counsel was incorrect about the employment of Juror 10, binding precedent from *Miles* "does not require remand."

¶50.     Regardless of what can be ascertained from a cold record on appeal, *Batson* and *Miles* require an articulated finding by the trial court.  It is the role of the trial court to conduct the analysis and make the finding, not that of an appellate court.  There is no alternate remedy for this error: as *Miles* held, "the remedy for the trial court's failure to follow the three-step *Batson* analysis is to remand for a hearing, limited to using the record as it existed at the time of the original *Batson* hearing, at which the proper *Batson* analysis must be completed." *Id*.

¶51.     Respectfully, the new approach by the majority creates an exception to precedent that is less than a year old and crafted by our Supreme Court.  This openly rejects the precedent of our Supreme Court in favor of a new one of its own construction.  There is no need to do this, and in any event we are bound to follow the precedent of our high court—regardless of

31

what we think of it, or whether remand is burdensome or messy.

¶52. For *Batson* safeguards not just the integrity of this trial but our whole system of justice—whether it is the prosecution or defense who is throwing the strikes. "Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try," the United States Supreme Court reckoned, but also "extend[ed] beyond that inflicted on the defendant and the excluded juror to touch the entire community." *Batson v. Kentucky*, 476 U.S. 79, 87 (1986).

¶53. With such high stakes, with such clear precedent, and with such a simple solution—remand for a post-trial hearing that might take fifteen minutes from beginning to end—we should not deviate from *Miles*. Because we don't follow binding precedent today as to Juror 10, I respectfully dissent to that component of the majority opinion.

**WESTBROOKS AND McDONALD, JJ., JOIN THIS OPINION.**